### SPEELER, ESTATE OF, In Re

Ohio Probate Court, Cuyahoga Co

Decided June 27, 1936

Kuth & Ehrke, Cleveland, for administratrix.

William H. Gillie, Cleveland, for William Feeney.

## OPINION

By BREWER, J.

This cause came on to be heard on a motion by William Feeney to vacate the appointment of Vera Ainsworth as administratrix of the estate of Eva Speeler. William Feeney alleges in his motion that he is the common law husband of Eva Speeler, deceased, and for that reason is entitled to appointment as administrator. The motion is opposed by Vera Ainsworth, administratrix, daughter of Eva Speeler, deceased. The sole question before the court is whether or not William Feeney is the common law husband of the decedent.

The evidence shows that the decedent had previously entered into a ceremonial marriage with a Mr. Neff and that children were born to said union, prior to his death in 1907. She then entered into a ceremonial marriage with Mr. Speeler, who died in 1913. After the death of said Mr. Speeler and prior to Mrs. Speeler's living with William Feeney she had been living with a Mr. Louis Marcus. The attorney for William Feeney admits in his closing argument, that after the death of Mr. Speeler, her second husband, and previous to her living with her alleged common law husband, she cohabited with the aforesaid Mr. Marcus, and that on the occasion of her meeting with Mr. Feeney, she used these words, to Mr. Marcus: "Bill is my man now and I don't want any more of you." Thereupon Mr. Feeney began to cohabit with her. The evidence further discloses that after Mr. Feeney's mother died, he moved some of her furniture into the hotel which was owned by Mrs. Speeler. He bought Mrs. Speeler an engagement ring. Mrs. Speeler introduced him to some of her relatives and told them that Feeney and she were married. They opened joint bank accounts. The evidence also shows that at the time Feeney was sick in the hospital, the nurses believed that he was her husband. This cohabitation continued from October, 1925 to March, 1936. It is further shown that Mr. Feeney did repairing and carpentering and had no other employment except around the hotel owned by Mrs. Speeler. On this evidence the court is confronted with deciding: does this constitute a common law marriage?

Common law marriages are recognized in Ohio, but as a matter of public policy such marriages are not favored. In re Barrett, 49 Bull, 222. This court is interested in the case at bar, from both a legal and a social point of view. A history of marriage and the customs on which ceremonial marriage is based, reveals that in the beginning, marriage was the result of capture and purchase. The method of capture was to take a girl by force and run away with her. As the tribes became more civilized, the idea of capture became in reality an agreement. A young lady who really wished to marry the young man in question would sham and offer very little or no resistance and the moment he rode off with her they were looked upon as man and wife by the tribe. In Gray's Travels a poem is found which gives evidence of the custom of wife capture. Purchase is self-explanatory and is still followed in some countries today.

The first ceremonial marriages were inaugurated by and received the approval of the Council of Trent, when in their 24th discussion in 1563 the "Decretum de Reformatione Matrimonii" was passed. At this session, concubinage was condemned and the validity of marriage made dependent on its being performed by a priest and in the presence of two or three witnesses.

In England by the Marriage Act of 1753, common law marriages were rendered invalid. This Act was made necessary in a large measure because of clandestine marriage and because of the loose and easy manner in which matrimony could be accomplished.

In the United States the Colony of New Plymouth enacted legislation as early as 1636 to regulate the law of marriages, and to discourage common law marriage. The General Assembly of New Hampshire,

March 16, 1679, passed the following law:

"For prevention of unlawful marriages; it is ordered that no person shall be joined in marriage, before the intention of the parties proceeding thereon, before three times published at some public meeting, in the town where the parties or either of them do ordinarily reside; and be set up in writing upon some posts of their meeting house door, in public view, and to stand so as it may be easily read, for the space of 14 days."

Otto E. Koegel, D.C.L., Professor of Domestic Relations, National University Law School, in his book on Common Law Marriages, page 9, gives the following introduction in this authoritative work:

1. That common law marriages have not been valid in England since 1753.

2. That such marriages were valid prior to that time, notwithstanding a decision of the House of Lords, in 1843 that they were never valid in England.

3. That such marriages were invalid at common law for possessory purposes, that is, the children could not inherit, the wife took no dower, etc.

4. That such marriages were invalid in some of the American colonies, and certainly contrary to legislation and the policy of all the colonies.

5. That the earliest decisions in the United States are against the validity of such marriages, but these decisions are not referred to in the decisions establishing the rule in this country.

6. That such marriages owe much of their validity to dicta of Chancellor of Kent in 1809.

7. That the Kent doctrine was not generally accepted until more than half a century later, the Supreme Court of the United States being evenly divided on the question in 1843.

8. That the early decisions in this country, both those establishing the rule and those denying it, are extremely poorly considered cases, citing no authority and of only a page or two in length, whereas, the English cases show that no one subject in their jurisprudence was ever more carefully considered, one case alone covering nearly four hundred pages.

9. That some states, apparently upholding the validity of common law marriages, have in effect discarded the rule "consensus non concubitas facit matrimonium," and adopted one, "concubitas facit matrimonium." In other words, some states require cohabitation in addition to words

of consent and thus we have one law providing that persons must cohabit before they become husband and wife (in itself anomalous) and another law providing that persons who do this without marrying are guilty of a crime.

10. That, strictly speaking, the common law doctrine is in most states recognized in name only; certainly in all of the states where the question has arisen marriage "per verba de futuro" has been discarded and the question of the validity of marriage "per verba de praesenti" without cohabitation has not frequently arisen.

11. That the American decisions show that the courts of this country have not carefully investigated the subject.

12. **That such marriages are opposed by the American Bar Association, The Commission of Uniform State Laws, all modern authorities on Sociology, Marriage and kindred subjects and should be abolished.**

It is interesting to note that one-half of the states have declared common law marriage null and void either by statute or decision. Martindale in his 1936 edition put the following states in that column:

Arkansas, California, Illinois, Maine, Maryland, Massachusetts, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Utah, Vermont, Virginia, Washington, West Virginia and Wisconsin.

In Richmond and Hall, Marriage of the State, (table on page 37), to the above list are added these states:

Arizona, Delaware, Kentucky, Louisiana and Tennessee.

West Virginia has a very fine equitable rule. Common law marriages in this state are not valid, but children of such marriages are legitimate. (106 W. Va. 615). This court can see the equity of such a rule, the children of such marriages being the innocent victims of circumstances. In this day and age, we can no longer feel that the sins of the parents shall pass to the children.

In the case at bar, the facts show that the woman previously had been twice married, knew what the law required, visited a marriage license bureau, and had previously been married by a person licensed to perform ceremonies. Her first husband died and she had a second ceremonial marriage, and when her second husband passed on she lived in the state of adultery with another man. It is a so well-established rule that it needs little comment, that adultery will never, however long continued, constitute marriage. **Schwartz v State, 13 C.C. 62.** The dece-

dent and Mr. Feeney lived within one-fourth of a mile of this court by actual speedometer reading. Had they desired a valid statutory marriage after the commencement of an adulterous cohabitation, it would only require their coming to this court and procuring a marriage license and having the ceremony performed by one so authorized to do. Certainly it was not shame that stopped them from doing this, because the residents of the decedent's hotel and their friends knew that Mr. Feeney at the start was taking the place of Mr. Marcus. A common law marriage must be based on the meeting of minds and a mutual contract, and must be followed by cohabitation and conduct which establishes belief among the neighbors that the relationship exists. **Gillmore v Dorning, 31 O.L.R., 588.**

We can only assume from these facts that Mrs. Speeler entered into this relationship for immoral purposes. She is a woman who had been twice married and was living with another man at the time Mr. Feeney entered the scene. He knew and the neighbors knew of the improper relationship of Mr. Marcus and this woman. (This court could as well be opened to the suggestion of whether Mr. Marcus is not or could not claim that he is the common law husband.) The evidence does not show that Mrs. Speeler got a divorce from Mr. Marcus; although it does show that they lived together for some years. This court cannot conceive of a man allegedly loving a woman enough to make her his common law wife, and yet not being interested enough for the sake of common decency to avoid the slightest suspicion by marrying according to law. According to the contention of counsel for Mr. Feeney, this court could well assume Mr. Marcus was the common law husband in the first place, and Mr. Feeney merely a man breaking supposedly matrimonial bonds. Where, then, can this court draw a line of demarcation between adultery and common law marriage? The court can only see Mr. Feeney as a man who has enjoyed matrimonial bliss but refused to accept the obligations of it. which would have required his entering into a contract of marriage, which would make him civilly liable for her care and support or criminally liable for bigamy should he have entered into another marriage during her lifetime. This court cannot believe that any jury would have convicted him of the crime of bigamy were he to offer in evidence the fact that she was twice married and produced Mr. Marcus as a witness to testify that she had been living with him. Now this man comes in after her death —admitting that he did not do any other work but in her hotel, eating her food, sharing her bed, and desires this court to pay him by declaring him an heir to her estate. The court has seen but few cases in which the male of the species has attempted to establish himself as a common law husband successfully. In Re Brush, 49 N. Y. S. 803, 806, the court expresses itself in this regard even in considering a woman:

"The term 'common law wife" is one not known to the law, and the law looks with no favor upon the connection indicated by it. If properly used this term is a synonym for a woman who, having lived in a state of concubinage with a man during the time when she might have been openly declared to be his wife if she were such, **only seeks to assume that relation openly after his death, and when she is impelled to it by the loss of the support he had given her and by a desire to obtain that support by sharing in the proceeds of his property."**

There is no religion, no minister of the Gospel, whether priest, minister, or rabbi who condones such marriages. This is one of the few instances where all persons, regardless of color or creed, social standards or political affiliations, are bound together in one common view that such marriages are prohibitive both in the sight of God and man.

In Goodsell in the History of Matrimonial Institutions, Volume 3, page 171, states as follows:

"Is it not an amazing fact, that, in a matter which so profoundly affects the dignity and stability of a family institution, society should be so slow to take enlightened action? **Surely, no legislative reform is more needed than clear and positive statutes declaring such loosely contracted unions null and void."**

The legitimacy of children is not in question in this case, **but the rightful inheritance of legitimate children is at stake.** Surely, if Mrs. Speeler had felt about Mr. Feeney as he claims she did, she could have made a will and disinherited her blood kin in favor of this man, but Mrs. Speeler is dead, her lips are forever shut, no human being can look into her mind.

The legal aspect is somewhat different. Laws are made by legislation and judges.

but public opinion is forever the predominate fact in back of those laws. Sometimes law and what the majority think is justice, do not coincide. The attorney for Mr. Feeney cites three cases, and the court will look for the facts involved in these cases, to determine the reasons for the rulings. In Carmichael v State of Ohio, 12 Oh St, 553, the court upheld a common law marriage, and held the man guilty of bigamy. It is most important to note that in this case the parties were married, but the person performing the ceremony was not authorized by law to perform marriages. Clearly then, both thought they were man and wife in accordance with statutory requirements. Umbenhower v Labus, 85 Oh St, 229, had to do with the legitimacy of children. Ivs v McNicoll, 59 Oh St, 402, has also to do with the legitimacy of children.

Some courts have taken pity upon a woman who has entered into this type of a contract and lost because of it, both her decency and her means of livelihood at the time of his death. But in this case we are confronted with the claim of a man.

In Duncan v Duncan, 10 Oh St, p. 181, decided prior to 1860, Supreme Court Judge Brinkerhoff, whose opinions have always been regarded most highly, with great foresight states the following:

"Finding ourselves, then, compelled by no preponderating force of authority to the adoption of a doctrine so loose as that which would be necessary to sustain the marriage claimed to exist in this case, we are unwilling to do so. It seems to us that grave considerations of public policy forbid it; that it would be alien to the customs and ideas of our people, and would shock their sense of propriety and decency. That it would tend to weaken the public estimate of the sanctity of the marriage relation; to observe the certainty of the rights of inheritance; would be opening a door to false pretenses of marriage, and to the imposition upon estates of suppositious heirs; and would place honest, God-ordained matrimony and mere meretricious cohabitations too nearly on a level with each other."

Some comment must be given to Umbenhower v Labas, 85 Oh St 238, which is cited as the authoritative case as to the legality in this state of common law marriage. As previously stated, the legitimacy of children was involved. Undoubtedly the court felt this was the important factor, with which

this court readily agrees. Judge Price said on page 249:

"In this respect, as in many others, there is always a stratum of society that prefers to shun and disregard legal ceremony and adopt coarser and less conspicuous ways of forming domesticate ties. It is the innocent offspring that the law would mercifully protect, and rather call them heirs than bastards."

By far the finest and boldest opinion on this subject that can be found is in Bates v The State of Ohio, 9 C. C., (N.S.), 273, which is affirmed, 77 Oh St, 622, on the ground that the evidence did not establish a common law marriage. Although the court in this case held that the defendant could not have been found guilty of bigamy the evidence is greatly similar to that offered in the case at bar:

"This evidence tended to prove that from about the 17th day of December, 1904, to some time in 1906, the accused and Hazel Ginter lived together at intervals, cohabiting together as man and wife; that a child was born to them as a result of this relationship, that their relationship as husband and wife was frequently acknowledged by the accused, who introduced her as his wife to various people; that at his mother's home she, in his presence, stated that they had been married and that he did not deny it, but thereafter, at his mother's home, occupied the same bed with Hazel Ginter and otherwise assumed the position of husband; that he rented rooms for housekeeping and bought furniture for housekeeping, stating to the landlord and to the furniture dealer, that she was his wife; that when their child was about to be born, he called on several physicians and endeavored to procure their services, stating to at least one of them that it was his wife who was about to be confined; that he was present comforting the woman when the child was born; and it not being born alive, he called in an undertaker and had the child buried, stating to the undertaker that this child was his child and that Hazel was his wife.

Many letters addressed by him to the woman were introduced, in all of which he used terms of affection and in one of which, dated November 12, 1904, he declares that he hopes that when they meet again they will not have to part until death parts them, and calls upon God to witness his love for her. His letters written after December 17, 1904, the date of his alleged

marriage to her, uniformly refer to her parents as Pa and Ma.

Most of this evidence is not denied by the accused, who frankly admits the essential parts of it.

And the court continues on pages 275 and 276 as follows:

"But ' notwithstanding these strict requirements of statute, it is claimed by counsel for the state that there is another form of marriage equally legal; that a marriage consummated in total disregard of the statutes will be equally valid; that a private arrangement called a common law marriage entered into by the parties, without a license from the state, without the publication of bans, without the services of minister or magistrate, without any ceremony whatever, without witnesses to the marriage itself, without any record of the existence of the marriage, without any definite promise of marriage, is just as effectual, just as legal and confers just the same rights upon the parties as a marriage in strict conformity to the statutory requirements which, in positive terms, specify the exact course of procedure requisite to a legal marriage, and impose several penalties for any violation of the rules prescribed.

"**The proposition is a startling one. If this be true, of what use are the statutory requirements? Why punish with fine and imprisonment the minister or magistrate or probate judge who inadvertently omits to do any one of the dozen formal things required by statute to be done when none of these things are essential to a valid marriage?** Why impose upon the contracting parties the expense and labor of filing statements, under oath, regarding all sorts of statistical matters, and the procuring of a .license, and the securing of the services of minister or magistrate, when all these things add nothing to the validity of a contract which they themselves may enter into without any of these formalities and without the embarrassment of witnesses? Why require statistics to be compiled or provided for, when, if all these formalities are unnecessary, they will certainly be neglected and the statistics will certainly be incomplete and inaccurate?"

On page 277, continues as follows:

"The mere fact of a man and woman living together in a state of fornication has never constituted a marriage recognized at common law, nor has a public acknowledgment of the relation of husband and wife, a holding of themselves out as husband and wife, accompanied by cohabitation, been ever deemed in itself a valid marriage at common law, although there seems to be a widespread popular notion that this constitutes a valid common law marriage and in this country the courts of some states have gone to great lengths in sustaining such acts as proof of an actual marriage."

In discussing the Carmichael case on page 281, the court continues:

"**The Carmichael case was decided forty-five years ago. In that time there has been a vast change in the condition of society.** It is a matter of common knowledge that in these latter days the stability of the family is threatened as never before by loose ideas of marriage. **The family is the foundation of the state. Marriage is the basis upon which the family rests.**

"It seems to us that the importance of the question is such as to demand an independent consideration, and in the hope that the Supreme Court will have an opportunity of finally passing upon this question and settling the law of the state, we venture to disregard the decision of Carmichael v State, in so far as it seems to us to extend beyond the actual facts of that case and to lay down a rule on matters not involved therein."

In 1907 the court with broad vision realized that the Carmichael case was 45 years old. Now 30 years have again elapsed, this country has increased greatly in size, the roads greatly improved, transportation of such modern design never conceived at the writing of the Bates decision. The covered wagon days are over. In this country there lives no person who cannot in some manner easily reach the County Court House, and partake of the gracious bounty of those who are by law endowed with the privilege of conducting the marriage ceremony. History has shown that at times, in years gone by, and still in some of the more remote parts of the United States, that in order to get to a Court House to obtain a marriage license, great hardships had to be undergone. In fact, in some of the southern states, years ago, a couple would marry by simply jumping over a gun lying on the ground in the presence of witnesses. And when the traveling minister would make his monthly or semi-annually trip to that section, they would have a church ceremony. By the wildest stretch of one's imagination such could not be the case in Cuyahoga County and most certainly is not the fact in the case at bar. A five

minute walk would have brought them to the Court House.

In discussing the marriage statute on page 285 of this opinion, the court states:

"The marriage statutes of Ohio are in form mandatory. We have found no rule of common law or ecclesiastical law that would justify us in supposing that the legislature meant anything else than what the statute so expressly declares. We know no rule of statutory construction that justifies us in reading into the statute a negation of its express terms. The repeated provisions of severe penalties on all those who neglect or fail to follow the precise formalities of the law as to marriage, seem to negative any idea that the legislature ever intended or had in mind any other legal form of marriage.

"It would seem a strange anomaly if a civil contract leasing real estate, or agreeing to answer for the debt of another or an agreement made upon consideration of marriage, is to be held void unless in writing, signed by the parties to the agreement; yet marriage itself, the most sacred and momentous contract in its consequences which it is possible for man to enter into, may be made by merely verbal promises or even without such promises."

And in conclusion, on page 286, the court holds:

"But common law marriages, however we are to understand that term are not yet so common as to be recognized anywhere as anything but exceptional. Our marriage laws are, and have always been, well-known and understood and a legitimate ceremonial marriage, either civil or religious, is the universal desire of all decent people contemplating matrimony.

"To break down the bars established by the statute, to make possible the substitution of loose and uncertain requirements for the time honored, fixed forms of the law is to open the way to all the forms of fraud and crime with which designing men may seek to destroy womanly virtue and with which unscrupulous women may seek to appropriate the good name and wealth of men to whom in life they were perhaps perfect strangers.

"If a private arrangement without any formalities, and without any writing or any record or any witnesses, is to be upheld as a civil contract; if secret marriages, known only to the parties themselves and participated in by none other than those parties are to be authorized; if the state is to have no right to protect its own interests, it is but one step further in the practice, now publicly advanced by certain notorious criminals and others, of having marriages on probation, the relation to cease at the will of either of the parties.

"If such is to be the law of Ohio, some other court must be the first to proclaim it."

Whether we seek to decide these facts in the light of common decency, by the great weight of judicial decisions rendered by a long line of illustrious jurists, or in the interests of those countless thousands who are yet to reach a marriageable age—we can come to but a single conclusion. In view of the authority vested in this court, it is impossible, in good conscience, from the evidence shown, to hold ▮▮▮ this a common law marriage, or to paraphrase the words of Judge Hurin, "If the evidence produced in this case constitutes a common law marriage, in accordance with the law of Ohio, some other court must first proclaim it."

The motion to vacate the appointment of the administratrix is overruled.