Ih re Estate of Maynard.*

(No. 992—Decided June 11, 1962.)

*Mr. J. Earl Pratt* and *Mr. William D. Kennedy,* for appellant Mary Compton (Maynard).
*Mr. William J. Curry,* for appellee Clifford Maynard, administrator.

Brown, J. Appellant, Mary Compton, a. k. a. Mary Maynard, filed a motion in the Probate Court of Lawrence County, Ohio, alleging herself to be the surviving spouse of the decedent and requesting the court to set aside the application and letters of administration previously issued to Clifford Maynard,

*Motion to certify the record overruled, January 30, 1963.  Appeal dismissed, 174 Ohio-St., 211.

the son of the deceased. Upon hearing, the Probate Court found that the appellant had not established that she was the surviving spouse of the decedent, and by entry of June 2, 1961, overruled the motion to set aside the application and letters of administration and the appointment of Clifford Maynard. A motion for a new trial was filed thereafter on June 12, 1961, and overruled on November 29, 1961.

Although seven assignments of error are listed by appellant, Mary Compton (Maynard), the principal question on appeal is whether the evidence adduced established a common-law marriage between Flem B. Maynard and Mary Compton (Maynard), thereby entitling her to letters of administration under Section 2113.06 of the Revised Code, as his surviving spouse.

Flem B. Maynard died January 27, 1960, a resident of Coal Grove, Lawrence County, Ohio. Pursuant to an application duly filed on February 5, 1960, Clifford Maynard, son of the decedent, was appointed administrator of his estate and letters of administration were duly issued. Thereafter, on February 19, 1960, appellant, Mary Compton (Maynard), filed the motion set forth above.

Flem B. Maynard was divorced from his first wife in 1939. In October 1945, Mary Compton (also known as Mary Maynard) moved to a house at 215 Memorial Street, Coal Grove, Ohio, where she lived with Flem B. Maynard until he died.

The other evidence adduced is succinctly stated in the trial court's opinion as follows:

"* * * a number of witnesses were presented and there is evidence that claimant lived in the home of deceased for a number of years, doing housework, such as cooking and cleaning and many other similar activities. Witnesses who were neighbors testified that they believed the parties to be married by reason of their cohabitation and demeanor. Mr. Corn, the mail man, testified of letters being sent to the home addressed to 'Mr. and Mrs.' Maynard. Mr. Snodgrass, an old friend of deceased, testified that he had been introduced to claimant as Mrs. Maynard in Russell, Kentucky. Such evidence tends to establish circumstantially an agreement of marriage. In 1951, an easement was executed by the parties, each signing the

same instrument and claimant being referred to as wife of deceased and signing the name of 'Mary Maynard.' A bank account card was signed by both in 1954, at which time claimant signed her name as Mrs. Mary Maynard.

"On the other hand several neighbors who observed them living together did not recall having heard Mr. Maynard refer to claimant as his wife. There was testimony that deceased denied the marriage and a contract was introduced wherein it appeared that the parties 'contemplated' marriage in 1955. In 1956 an agreement was produced wherein claimant appears as an unmarried person.

"Other evidence was introduced, both in support of claimant's contention and to the contrary, and in 1959 a hospital record indicates claimant at that time to be deceased's spouse."

Administrator's exhibit A in evidence is an anti-nuptial agreement between Flem B. Maynard and Mary Compton dated February 25, 1955. Section 7 provides:

"This agreement shall be in no wise construed to mean that either party is obligated to marry the other." Section 4 provides:

"All property of either shall be distributed as if the deceased survives the other."

The document was signed by deceased and the claimant who denied her signature, but the expert witness of claimant was of the opinion that the signature was that of Mary Compton, the claimant. The notary who acknowledged the signatures testified as to that act. In the motion for new trial claimant attempted to show fraud, claiming page one of the document was of a different type paper than pages two and three and was typed with a different typewriter than that used on pages two and three, and that page one was typed by a different person than the other pages. The trial court properly found no fraud had been established on the basis of this evidence alone.

Witness Clifford Maynard testified that the deceased gave him the agreement in 1955 with instructions to put it in a safe place, and the witness Wilda Stanley testified as to conversations with claimant wherein reference was made to the signing of papers and each party having "own money."

In arriving at its conclusion that no common-law marriage existed, the trial court aptly stated its views as follows:

"Frequently circumstances under which a man and woman cohabit are such that for convenience and to avoid embarrassment an appearance of legality is desirable before friends and associates and although a continued cohabitation consistent with marriage is evidence tending to establish same it is not conclusive. Documents signed by the parties are of greater weight in many instances. In this case the documentary evidence is in conflict but of the various documents introduced the administrator's Exhibit 'A' is the most direct and applicable document dealing with the issue herein presented. Whereas it is conceivable that for convenience or simplicity a signature might be affixed to a deed releasing dower or other rights of a spouse thereby relieving the necessity for explanation, the explanation is not forthcoming as to the reason for a direct and positive statement by both parties under oath that they contemplate marriage and agree to property rights between them, providing, however, that their agreement is not to be construed to *obligate* either to *marry* the other when or if they were already married at the time of entering into such a contract."

As stated by the Court of Appeals for Athens County in *Brawley* v. *Thomas, Admr.,* 82 Ohio App., 400, if a common-law marriage is entered into by a man and woman with all necessary elements present, then neither nor both could thereafter abrogate or nullify the same before death other than according to law, yet in determining the relationship existing between these parties during these years documentary evidence "carries great weight" and "in the absence of a satisfactory explanation, therefore, it is most conclusive."

The second assignment of error is that the court erred in excluding evidence offered by claimant, Mary Compton (Maynard), after evidence on the same subject matter had been offered by the adverse party.

On page 30 of the record, Mrs. Cassidy, a witness called for the appellant, was asked on cross-examination by the attorney for the administrator the following question:

"Q. What did she tell you? A. She only told me what the dirty trick he pulled on her.

"Q. What was the dirty trick she said Mr. Marynard pulled on her? A. He performed a marriage that wasn't legal."

On page 150 of the record, Clifford Maynard, the adminis-

trator, was asked by his attorney the following questions and gave the following answers:

"Q. Did your dad ever tell you whether or not he was married? A. Yes, he did.

"Q. Did he ever mention Mary Compton's name? A. Yes, he did.

"Q. What, if anything did he say in reference to Mary Compton and marriage? A. He said they wasn't married."

Later, Mary Compton was called to the stand and asked questions concerning the transaction whereby she was purported to have entered into a marriage ceremony with Flem B. Maynard. The answers were excluded by the court as being in conflict with the so-called "Dead Man's Statute," Section 2317.03 of the Revised Code.

The following questions and proffered answers were thereafter offered by the attorney for the appellant in the record:

"Q. Mrs. Maynard, did you ever make an oral agreement with Flem Maynard to marry him?

"By William J. Curry: We object.

"Court: Objection sustained.

"By J. Earl Pratt: May we proceed your Honor, since this is not a trial to the jury but to the court and in order to save time and proffer these answers subject to object * * *?

"By J. Earl Pratt: We would expect the answer to be that the witness did enter into a verbal agreement to marry Flem B. Maynard.

"Q. Now, did you enter into a formal marriage ceremony with Flem B. Maynard?

"By William J. Curry: We object.

"Court: Objection sustained.

"By J. Earl Pratt: We proffer the answer that she did.

"Q. Where was that ceremony performed?

"By William J. Curry: Objection.

"Court: Objection sustained.

"By J. Earl Pratt: We proffer the answer that it was at the home of a man at Genoa, West Virginia, whom Flem Maynard told her was his cousin.

"Q. Did you before this ceremony was performed go to the Court House at Wayne, West Virginia, and we proffer the answer that she did.

"Q. Did you later learn that there was a question about the legality of the performance?

"By William J. Curry: We object to the form of the question and ask the question be stricken.

"Court: Objection sustained.

"By William J. Curry: And that he not be permitted to proffer his answer to that question.

"Court: That objection is overruled.

"By J. Earl Pratt: The answer is that she did.

"Q. When did you first learn that there was some question about your marriage relationship?

"By William J. Curry: We object to the question as to form. We object to the question under the statute that we are going by the Dead Man Statute. Beyond there, we ask that he not be permitted to proffer an answer.

"Court: As I understand the question, Mr. Pratt, the question does not relate to any ceremonial marriage which you contend occurred but merely to the legality of a marriage relationship.

"By J. Earl Pratt: No, it does relate to the legality of the claimed ceremonial marriage.

"Court: Objection sustained.

"By J. Earl Pratt: We proffer the answer that it was in the year 1954.

"Q. What did you do when you learned that there was a question about the legality?

"By William J. Curry: We object.

"Court: Objection sustained.

"By J. Earl Pratt: We proffer the answer that she wrote to the court house at Wayne, West Virginia.

"By William J. Curry: We object for the same reason stated previously.

"Q. Did you receive a reply?

"By William J. Curry: We object.

"Court: Objection sustained.

"By J. Earl Pratt: The reply will be that she did and that it stated that there was no record of her marriage there."

Assuming that the questions were within the scope of the exceptions of the "Dead Man's Statute" because of their nature, and that such testimony is admissible because the questions of the attorney for the administrator did open the door

to admit testimony which was otherwise inadmissible, would the admission of this evidence have been of such a nature as to warrant a reversal in this case?

"That it would not have been error to admit certain evidence does not necessarily make its exclusion ground for reversal. It must appear that such exclusion was, or may have been, susbstantially prejudicial to the party by whom the evidence was offered, or, in other words, there must be some reason to think that its admission would, or might, have resulted in a different verdict or finding. * * *" 4 Ohio Jurisprudence (2d), 122, Section 893.

In our opinion, the excluded evidence would only have shown an invalid agreement made in West Virginia between Mary Compton and Flem B. Maynard.

Section 4683 of the West Virginia Code of 1961, provides:

"Every marriage in this state shall be under a license solemnized as provided in this article."

This section is held mandatory and where "a formal ceremony is performed in this state without a license therefor issued under the provisions of Code 48-1, the parties thereto do not attain the legal status of husband and wife, the attempted marriage being void." *Kisla* v. *Kisla,* 124 W. Va., 220, 19 S. E. (2d), 609.

Section 4684 of the West Virginia Code provides in part:

"Every license for marriage shall be issued by the clerk of the county court of the county in which the female to be married usually resides except, in cases of a female who is a nonresident of the state of West Virginia, by the clerk of the county court of the county in which application is made * * *."

Common-law marriages are not valid in West Virginia. *Beverlin* v. *Beverlin,* 29 W. Va., 732, 3 S. E., 36.

The syllabus prepared by the Supreme Court of West Virginia in that case is as follows:

"1. Common-law marriages, when contracted in this state, are not recognized by our courts as valid.

"2. No marriage contracted in this state is valid when it affirmatively appears that it had not been solemnized according to the requirements of our statute on that subject, although the parties may thereafter have associated and cohabited together as husband and wife."

There is no evidence before the court indicating any license

to marry was ever issued to these parties in West Virginia. All the proffered testimony would show is the nonexistence of any such proof in the county in which the ceremony was purported to have taken place.

Since there is no common-law marriage in West Virginia and any attempted marriage without a license is void there, could such testimony be helpful to prove a common-law marriage later in Ohio? We think not.

The case of *Charrier* v. *State* (1918), 29 C. C. (N. S.), 97, 30 C. D., 578, is a learned and witty opinion of Judge Grant of the Court of Appeals reversing a conviction for adultery for the reason that the meretricious relations of the parties in France relied on to establish a common-law marriage were insufficient to establish a common-law marriage in France which country did not recognize such marriages, and by which the validity of the claimed marriage was to be measured and tested.

In the case of *Rea* v. *Fornan* (1942), 37 Ohio Law Abs., 135, it is held that the *lex loci* is controlling on marriage contracts as well as on all others.

The question of *lex loci* was involved in *Knight* v. *Shields* (1935), 19 Ohio Law Abs., 37. The contract in that case was made in Tennessee which state did not recognize common-law marriages. The court states:

"A contractual common-law marriage like all other contracts is controlled by the law of the place where made. If the state where the claimed contract is entered into does not recognize common-law marriages, the same would not be recognized in this state on the contract alone."

*Jenkins* v. *Jenkins,* 30 Ohio App., 336; 26 Ohio Jurisprudence, 32, Section 21.

With respect to the invalidity of the agreement in West Virginia, it should be unnecessary to burden this opinion with the authorities relative to the impossibility of the reaffirmance of an invalid contract, and no novation is claimed or proved in this case. There is no claim an agreement *in praesenti* was ever entered into in Ohio. Under these circumstances we must conclude the relationship of the parties was meretricious and illicit.

The law requires that the presumption that this meretricious relationship continued as it began must be removed before a common-law marriage relationship can be held to exist. *Days* v. *Thompson, Admr.,* 3 Ohio Law Abs., 634.

In the case of *Lumas* v. *Lumas,* 26 Ohio App., 502, the rule is that the continuance of the presumption of former illicit relations is as follows:

''1. Where parties lived together in illicit relationship before plaintiff procured divorce from her husband, it is presumed that their living together thereafter continued to be illicit, and such cohabitation shows no relation on which a common-law marriage contract may be predicated, especially in view of evidence showing their dealings with their individual property as though they were unmarried.''

There is ample evidence in this case showing dealings by the individual parties as though they were unmarried.

The admission of the proffered evidence would have only weakened appellant's position and would in fact have strengthened the judgment of the trial court.

We have carefully reviewed the evidence, pleadings, authorities cited in the briefs and the bill of exceptions, and we agree with the trial court that appellant has failed to establish by clear and convincing evidence the existence of a common-law marriage between Flem B. Maynard and herself.

The assignments of error are not well taken, are overruled, and the judgment of the Probate Court of Lawrence County is affirmed.

In conclusion, we have reviewed the abundance of case law on this subject and the myriad of situations in this state in which common-law marriage was attempted to be established. Unfortunately, most of these have had their superstructures valiantly erected on a foundation of straw and necessarily fell because of public policy and the inadequacy of proof by clear and convincing evidence of the essential elements necessary to qualify for that status. Helpful sources worth noting include: *In re Estate of Speeler* (1936), 22 Ohio Law Abs., 223; Common Law Marriage in Ohio, 5 Ohio State Law Journal 175; and the 49-page opinion of Judge Kenneth T. Stevens of the Probate Court of Ross County, which this court had before it, in *In re Estate of Green,* Ross County Court of Appeals No. 458.

In view of the magnitude of the litigation involved on this subject and the paucity of affirmative results, we feel obliged to agree with the feelings of Judge Brewer in *In re Speeler, supra,* uttered 26 years ago, quoting from Goodsell in the History of Matrimonial Institutions:

" 'Is it not an amazing fact, that, in a matter which so profoundly affects the dignity and stability of a family institution, society should be so slow to take enlightened action? Surely, no legislative reform is more needed than clear and positive statutes declaring such loosely contracted unions null and void.' "

*Judgment affirmed.*

RADCLIFF, P. J., and COLLIER, J., concur.