### In re: Estate of Hall
*[Cite as 3 AOA 94]*

*Case No. 89 CA 9*
*Washington County, (4th)*
*Decided May 22, 1990*

*Lambe & Burton, Julie A. Lambe, Marietta, Ohio, for appellant, Denise Chancellor.*

*Randall G. Burnworth, Marietta, Ohio, for appellee, Randall G. Burnworth, as Administrator of the Estate of Alan Curt Hall.*

STEPHENSON, J.

This is an appeal from a judgment entered on February 3, 1989 by the Washington County Common Pleas Court, Probate Division, denying a motion of Denise Chancellor, appellant herein, filed in the estate of Alan Curt Hall, deceased, to remove Randall G. Burnworth as administrator and appoint her in his place by reason of her status as the common-law wife of the decedent. The following error is assigned:

"THE TRIAL COURT ERRED BY APPLICATION OF THE WRONG LEGAL STANDARD TO THE FACTS BECAUSE THE COURT

VIEWED COMMON LAW MARRIAGE WITH DISFAVOR AND APPARENTLY REQUIRED A STANDARD OF PROOF GREATER THAN 'CLEAR AND CONVINCING."

The following facts pertinent to this appeal, many of which are undisputed, appear in the record which includes a transcript of proceedings two hundred in length embodying the testimony of twenty-two witnesses and forty-nine documentary exhibits for appellants and three for appellee.

Denise Chancellor (Denise) and Alan Curt Hall (decedent) were specialists in instrumentation in connection and plumbing and pipefitting and both worked through a plumbers union. Prior to 1986, Denise and decedent were married to other persons and each had two children as issue of their marriages. In 1986 both Denise and decedent were separated from their respective spouses and began living together in June of 1986. Divorce actions were then pending. In August 1986 Denise was divorced from her husband and on January 23, 1987 decedent was discovered from his wife. Thereafter Denise and decedent continued to residue together and had a close relationship, not only working together but also spending the non-working hours together in social and other activities.

At a family outing on July 4, 1988, tragically decedent accidentally drowned while swimming. On July 13, 1988, Randall G. Burnworth was appointed administrator of the estate, the application not setting forth the name of a surviving spouse. On August 2, 1988, appellant filed an application to remove appellee and appoint her since she was the common-law spouse and desired to administer the estate.

After hearing, the court issued a decision and judgment entry finding appellant was not married to decedent and denied the removal motion. The decision, inter alia, set forth findings as follows:

"Decedent and Denise started cohabiting in June, 1986 both decedent and Denise were still married to their former spouses]. They cohabited continuously until decedent's untimely death.

"At no time after decedent's divorce did the parties enter into a civil marriage contract. However, according to Denise, they did plan to participate in a civil marriage ceremony after they finished remodeling decedent's house on the West Side of Marietta.

"During the time they lived together they shared expenses. They each had separate checking accounts. Denise at times paid financial obligations which were solely those of the decedent from her own account. Although Denise named the decedent as beneficiary on her individual retirement account, on her private life insurance policy and on her employment life insurance policy, decedent did not reciprocate.

"They were employed at the same job site. They spent a great deal of their work time, as well as their leisure time together. They took vacations together; and while in Florida they purchased a time share interest in a condominium for one week per year. However they signed the purchase contract in their individual names, making no reference to their marital status.

"They attempted to borrow money in November/December, 1987 from the Marietta Savings and Loan Company for the purpose of remodeling decedent's house on the West Side of Marietta. In this application the parties held themselves out as being *un*married.

"On their 1987 Federal Income Tax returns decedent and Denise listed their marital status as 'single' and *not* as 'married filing singly'.

"In September, 1988 Denise filed an application for death benefits as beneficiary of decedent with the Plumbers & Pipefitters Union. On the application she listed herself as beneficiary but did *not* list herself as decedent's spouse.

"At no time after his divorce from his former wife did the decedent change or attempt to change the name of the beneficiary on any of his life insurance policies or pensions into Denise's name. The decedent in fact is reported to have made statements very near to the time of his death that he would never marry Denise and that he had aspirations of some day reconciling with his former wife.

"Decedent and Denise acted in some respects similarly to the way a married couple would act. Although some of their acquaintances thought they were married, others did not think they were married.

"The Court finds that Denise A. Chancellor has failed to prove by clear and convincing evidence that she and the decedent entered a mutual agreement of marriage in the present; that they cohabited as husband and wife; and that they were treated and received as husband and wife in the community in which they lived."

The law of Ohio respecting establishment of common law marriage is succinctly summarized in the per curiam opinion of *Nestor v. Nestor* (1984), 15 Ohio St. 3d 143, 145, as follows:

"A common law marriage is the marital joinder of a man and a woman without the benefit of formal papers or procedures. Such marriages are not favored in Ohio, but have long been recognized as lawful if certain elements or circumstances are found to be present. *Carmichael v. State* (1861), 12 Ohio St. 553: *Lawrence RR. Co. v. Cobb* (1878), 35 Ohio St. 94; *Ives v. McNicoll* (1899), 59 Ohio St. 402; *Umbenhower v. Labus* (1912), 85 Ohio St. 238; *Markley v. Hudson* (1944), 143 Ohio St. 163 [28. O.O. 81]. See also, 45 Ohio Jurisprudence 3d (1983) 428, Family Law, Common-Law Marriage, Section 44.

"The necessary elements in order to establish a common law marriage were set forth by this court in *Umbenhower, supra*. The syllabus provides as follows:

"An agreement of marriage *in praesenti* when made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, they being so treated and reputed in the community and circle in which they move, establishes a valid marriage at common law * * *.

"The fundamental requirement to establish the existence of a common law marriage is a meeting of the minds between the parties who enter into a mutual contract to presently take each other as man and wife. The agreement to marry *in praesenti* is the essential element of a common law marriage. Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation. Although cohabitation and reputation are necessary elements of a common law marriage, this court has previously held that standing alone they do not constitute a common law marriage. *In re Redman* (1939), 135 Ohio St. 554 [29 O.O. 143].

"The contract of marriage *in praesenti* may be proven either by way of direct evidence which establishes the agreement, or by way of proof of cohabitation, acts, declarations, and the conduct of the parties and their recognized status in the community in which they reside. However, all of the essential elements to a common law marriage must be established by clear and convincing evidence. *Markley v. Hudson, supra*, at 169; *In re Redman, supra*, at 558.

"Where there is no direct proof in reference to the formation of the contract of marriage *in praesenti*, testimony regarding cohabitation and community reputation tends to raise an inference of the marriage. This inference is given more or less strength according to the circumstances of the particular case. The inference is generally strengthened with the lapse of time during which the parties are living together and cohabitating as man and wife."

No evidence was adduced by appellant of an express agreement *in praesenti*. However, such is not required and the agreement may be established by inference from other evidence as provided for in *Nestor v. Nestor*, supra. Appellant sought to establish her claim of common-law marriage based upon the nature and continuing relationship of the parties. There was evidence adduced tending to establish by inference a common-law marriage. While the lower court's factual findings are supported in the record, there was also evidence of open cohabitation, the intermingling of finances, the joint purchases of property and stock, recognition of at least part of decedent's family as to a common-law marriage, including placement of appellant's name on the tombstone as wife, and on occasion the introduction of appellant by decedent as his wife.

The thrust of the argument in support of the assignment of error is that the court below erred in evaluating the evidence by application of a burden of proof greater than of clear and convincing evidence. Appellant urges this is demonstrated primarily by the court's citation of that portion of *In re Redman* (1939), 135 Ohio St 554, wherein the court stated, inter alia, "[T]he statutes of Ohio contain definite regulations and requirements and prescribe rigid standards to which applicants for marriage license must conform. While these statutory provisions do not of themself (sic) specifically prohibit marriage without formalities enumerated by those provisions, such informal marriage (sic) are seldom recognized and are held by courts only to protect the rights of innocent persons."

We agree with appellant that subsequent decisions of the Ohio Supreme Court do not woodenly apply the quoted language. See *Markley v. Hudson* (1944), 135 Ohio St. 163, and *Nestor v. Nestor*, supra. We are not, however, persuaded that the decision of the court below applied an incorrect standard. It is appellant's burden, as a basic principle of appellate review, to affirmatively demonstrate in the record the error claimed. The decision below recites the burden of proof to be clear and convincing evidence, sets forth citations to cases so holding, and concludes "[T]he Court finds that Denise A. Chancellor had failed to prove *by clear and convincing evidence* that she and decedent entered a mutual agreement of marriage in the

present..." (Emphasis added) The following is stated in the third paragraph of the syllabus in *City of Columbus v. Guthmann* (1963), 175 Ohio St. 282:

"In the absence of some showing to the contrary, there is a presumption that a trial judge performed his duty and did not rely upon anything in reaching his decision that he should not have relied upon."

In sum, on the record before us, we conclude that the court below applied the proper burden of proof since a contrary conclusion could only be reached by speculation and conjecture.

Although not directly assigned as error, we also conclude that there is probative and substantial evidence to support the judgment below. On review, judgments supported by competent credible evidence going to all the essential issues in the case may not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Cost. Co.* (1978), 54 Ohio St. 2d 279. The probate court, as the trier of fact, had the duty to assess the credibility of witnesses and the weight to be assigned to their testimony.

As the decision of the trial court states, the court relied, in part, upon the failure of appellant and the deceased to sign purchase documents and income tax returns as reflecting a marital status and that no change was made by decedent as to the beneficiary of his life insurance or pension benefits. Further, the court apparently credited, as was its prerogative, testimony that the deceased stated that he would not marry appellant and hoped some day to reconcile with his former wife. While there was conflicting evidence as to other issues, the court resolved them in favor of appellee.

Finally, this writer approves of the statement by Justice William B. Brown writing in dissent in *Nestor v. Nestor,* supra at 149, wherein he stated the following:

"Moreover, I call upon the legislature, in this last quarter of the Twentieth Century, to act to abolish the antiquated institution of common law marriage in Ohio. The days of the walking preacher and of the bishop on horseback are long gone. As was stated in *In re Estate of Maynard* (1962), 117 Ohio App. 315, 324 [24 O.O2d 95]:

"Is it not an amazing fact, that, in a matter which so profoundly affects the dignity and stability of a family institution, society should be slow to take enlightened action? Surely, no legislative reform is more needed than clear and positive statutes declaring such loosely contracted unions null and void."

For the reasons above set forth, the assignment of error is overruled and the judgment affirmed.

*Judgment affirmed.*

GREY, J., concurs with opinion.
HARSHA, J., concurs with opinion.

HARSHA, J., concurring.
I do not join in the call for legislative abolition of common law marriage, but otherwise concur in judgment and opinion.

GREY, J., concurring.
I concur in the judgment and opinion, but would add that I cannot agree with the suggestion that common law marriages no longer be recognized. The ultimate philosophical question, as I see it, is should we have laws which reflect the way we want people to behave, or should we have laws which actually reflect the way they behave? Some common law marriages are of long duration, and have brought stability and happiness into the lives of the parties. Whatever the reason parties do not chose a ceremonial marriage, the unmistakable fact of life is that there are many long term common law marriages, which are real marriages in every sense of the word.

Common law marriages occasionally cause a problem for the courts which have to decide whether or not a common law marriage, in fact, exists. This is not a major problem for the courts, particularly in light of the clear standards for deciding such a case as set out in the majority opinion.

If we refuse to recognize these kinds of marriages, we will often work a terrible injustice. A woman may have lived with a man for forty years, held herself out as his wife, borne his children, helped him through the bad times, celebrated the good times, and done everything a good and faithful wife might have done. But when he dies, we will ignore the fact of their life together, deny her survivor benefits, her right to share in his estate, even her right to bury him, for in the eyes of the law, this helpmate of a lifetime is only a legal stranger. We will do all this and call it just, solely so a court can avoid having to decide, every now and then, a close case such as we have here.

The issue is not whether common law marriages are antiquated because we still get them regularly. The question is whether we will continue to have the common decency to recognize them.

One final comment is needed on the rationale mentioned by Justice Brown in *Nestor, supra,* that common law marriages were recognized because of the shortage of clergy in a frontier society. This is mistaking the rationale for the reason.

There was, of course, no common law marriage at common law. As the American system of justice was developing, it made a deliberate attempt to differentiate itself from the English common law, particularly in those areas which were regarded as unjust, e.g. the rule of primogeniture, or the standard for adverse possession. With each break from the common law, a rationale was given, but looking to the rationale provides no insight into the underlying reason for the break.

The adoption of the doctrine of a common law marriage is typical. The rationale used for common law marriages was that frontier society was widely scattered and thus it was difficult to obtain a ceremonial marriage. While this may have been a good rationale, it is hardly in accord with the real circumstances of frontier life.

While it is true that frontier society was widely scattered, the pioneers were not anti-social and indeed had an active social life of various gatherings on certain occasions throughout the year. Everybody would come to one place to party, and the presence of preachers or civil officials empowered to perform marriages was common. It was not all that difficult to get married, if one had a mind to do it.

But some people did not. Recognizing that frontier people were an independent sort, that personal independence was a touchstone of the American dream, and recognizing that not recognizing an otherwise valid marriage would work an injustice, the concept of a common law marriage was adopted. The rationale used was the shortage of preachers, and the difficulty of travel, a rationale which would readily come to the mind of the circuit riding judge.

If we are to reject the concept of common law marriage, we should not use the inappropriateness of an outdated rationale as a substitute for reasoning. If we are to do away with common law marriages, we must do so only if we reject the reasons that convinced the early American courts to adopt it. There were good reasons then, and there are good reasons now, for the idea of a valid common law marriage. Justice Brown's argument against common law marriage is both bad history and bad law.