NESTOR, APPELLANT, *v.* NESTOR, EXR., ET AL., APPELLEES.

[Cite as Nestor *v.* Nestor (1984), 15 Ohio St. 3d 143.]

(No. 84-450—Decided December 31, 1984.)

144

Mr. *Edward C. Maher*, for appellant.
Mr. *Dean Konstand*, for appellees.

*Per Curiam.* A common law marriage is the marital joinder of a man and a woman without the benefit of formal papers or procedures. Such marriages are not favored in Ohio, but have long been recognized as lawful if certain elements or circumstances are found to be present. *Carmichael* v. *State* (1861), 12 Ohio St. 553; *Lawrence RR. Co.* v. *Cobb* (1878), 35 Ohio St. 94; *Ives* v. *McNicoll* (1899), 59 Ohio St. 402; *Umbenhower* v. *Labus* (1912), 85 Ohio St. 238; *Markley* v. *Hudson* (1944), 143 Ohio St. 163 [28 O.O. 81]. See, also, 45 Ohio Jurisprudence 3d (1983) 428, Family Law, Common-Law Marriage, Section 44.

The necessary elements in order to establish a common law marriage were set forth by this court in *Umbenhower, supra.* The syllabus provides as follows:

"An agreement of marriage *in praesenti* when made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, they being so treated and reputed in the community and circle in which they move, establishes a valid marriage at common law * * *."

The fundamental requirement to establish the existence of a common law marriage is a meeting of the minds between the parties who enter into a mutual contract to presently take each other as man and wife. The agreement to marry *in praesenti* is the essential element of a common law marriage. Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation. Although cohabitation and reputation are necessary elements of a common law marriage, this court has previously held that standing alone they do not constitute a common law marriage. *In re Redman* (1939), 135 Ohio St. 554 [29 O.O. 143].

The contract of marriage *in praesenti* may be proven either by way of direct evidence which establishes the agreement, or by way of proof of cohabitation, acts, declarations, and the conduct of the parties and their recognized status in the community in which they reside. However, all of the essential elements to a common law marriage must be established by clear and convincing evidence. *Markley* v. *Hudson, supra,* at 169; *In re Redman, supra,* at 558.

Where there is no direct proof in reference to the formation of the contract of marriage *in praesenti,* testimony regarding cohabitation and community reputation tends to raise an inference of the marriage. This inference is given more or less strength according to the circumstances of the particular case. The inference is generally strengthened with the lapse of time during which the parties are living together and cohabitating as man and wife.

Where there is direct evidence concerning the formation of the contract of marriage *in praesenti* and a finding by the court, as here, that such a contract exists, the evidence of long-time cohabitation and reputation of living together as man and wife should be given even greater weight to further strengthen the inference of marriage.

As to the element of cohabitation, there must be proof that the parties had sexual activity in the open manner of husband and wife in a marital state. Secret cohabitation with its attendant indicium of concealment concerning the sexual activity of the parties will not suffice as evidence of a valid common law marriage.

As to the element surrounding the reputation of the parties in the community as being man and wife, in order to establish a common law marriage it is not necessary that they disseminate information to all society generally, or to all of the community in which they reside. Rather, there must be a holding out to those with whom they normally come in contact. A common law marriage will not necessarily be defeated by the fact that all persons in the community within which the parties reside are not aware of the marital arrangement, nor by the fact that all persons with whom they normally come in contact are also unaware of the arrangement.

In the instant case, the parties did not raise, either in the appellate

court or in this court, a question as to the existence of the contract of marriage *in praesenti*. As previously stated, the trial court found that the parties entered into a contract to marry on July 1, 1970. Due to this finding, appellant takes the position that there is no need to determine whether the other elements are present herein in that such elements are only matters of proof to be offered in a particular case where there is no direct evidence to show the existence of the marriage agreement. We are unable to agree with this portion of appellant's argument.

There is a noted difference among authorities as to whether evidence of the remaining elements which constitute a common law marriage, cohabitation and a reputation in the community as being husband and wife, is necessary when there exists direct proof of a contract of marriage *in praesenti*. 45 Ohio Jurisprudence 3d (1983) 437, Family Law, Common-Law Marriage, Section 51. This cited article states that some authorities follow the view that cohabitation and reputation are not necessary to the establishment of a common law marriage, but are only evidentiary facts from which the existence of the contract may be inferred.[1]

Although there has been some case law to the contrary in Ohio,[2] this court has consistently required proof of both cohabitation and reputation following the contract in order to establish the existence of a common law marriage. Today, we again choose to follow this time-tested rationale.

Turning to the facts of this case, there exists no question of the existence of the contract of marriage *in praesenti* as found by the trial court. As to the element of cohabitation, there was more than ample evidence to show that the parties had cohabited openly and as a married couple. This evidence was by way of Eleanor's testimony that she slept with Hobart in the downstairs bedroom at all times after moving into the residence, and their registration and sleeping arrangements in hotels and motels on their various trips. In addition, there was testimony that upon visiting the home of Eleanor and Hobart, a member of the family had slept in the upstairs bedroom while her host and hostess slept together in the downstairs double bed. It is our view that appellees have produced very little evidence to contradict the existence of the requisite element of cohabitation.

The final elements, and unquestionably the most difficult herein, are those concerning the holding out of the parties' marital status in their community, and the corresponding knowledge of such status within the community and those in contact with the parties. Initially, we relate back to the evidence that the parties notified Eleanor's daughter of the agreement, that during the same week the parties visited a number of Hobart's married friends and announced the marriage, and that Eleanor had been

---

[1] See 52 American Jurisprudence 2d (1970) 900, Marriage, Section 44.

[2] See *Gatterdam* v. *Gatterdam* (1949), 86 Ohio App. 29 [39 O.O. 347].

introduced to other friends of Hobart in public or social gatherings as being married to Hobart.

There was also evidence that Eleanor agreed that knowledge of the marriage would be withheld from Hobart's mother, and that Eleanor accommodated this request by keeping her records in her former married name. The mere fact that Eleanor maintained her former married name for her own business purposes does not, in itself, defeat the common law marriage. In today's social structure, we may take judicial notice that many married women maintain their former maiden or married names, and there is no law that a married woman use her current married name.

Additionally, the record shows that the parties continued throughout their lives together to meet with friends as husband and wife, and to register into public accommodations as husband and wife. Furthermore, there was evidence that friends and members of the family sent greeting cards and later, sympathy cards, to appellant addressed to "Mrs. Eleanor Nestor" or "Eleanor Nestor." What must carry considerable weight in support of the marital status of the parties is the period of time which Eleanor and Hobart lived together sharing their lives, their families, their friends, the household duties and expenses and their worldly goods. The record shows that they shared all of this for a period of twelve and one-half years.

Although there was evidence that Hobart did have a relationship with another woman on three occasions during this twelve and one-half year period, this activity was unknown to Eleanor and she maintained faithfulness to Hobart throughout these years. Certainly it is very supportive of such faithfulness that Eleanor remained attentive to the demanding medical and physical requirements of Hobart during his worsening condition due to "Lou Gehrig's disease" and did so up until the day of his death. There is absolutely no evidence that Eleanor had carried out these duties in the capacity of a nurse, as there was no suggestion that she was paid a fee for such services. Nor would it be reasonably assumed that she did these things just as a "close friend" of Hobart. To the contrary, these actions are those that would be carried out by a wife devoted to her husband.

Perhaps even more telling is the fact that after Hobart's death, the family agreed that his death notice would set forth Eleanor as his surviving spouse. The abrupt change in the family's acceptance and recognition of Eleanor's position as wife of Hobart apparently came only after a period of reflection following his death. This, in our view, is an ineffective repudiation of a legally established marital relationship.

Based upon all of the evidence presented at the trial on this matter, we conclude that a common law marriage was established between Eleanor and Hobart Nestor, and that the lower courts erred in holding that such elements had not been proved by clear and convincing evidence.

Accordingly, the judgment of the court of appeals is reversed.

*Judgment reversed.*

CELEBREZZE, C.J., SWEENEY, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

W. BROWN and LOCHER, JJ., dissent.

WILLIAM B. BROWN, J., dissenting. In my opinion, the majority has failed to remain mindful of the long-established rule that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case * * * [should] not be reversed by a reviewing court as being against the manifest weight of the evidence." *C. E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261]. Accordingly, I dissent.

The requirements necessary to establish a common law marriage must be unquestionably fulfilled. The state of Ohio has promulgated a statutory means of establishing a marital relationship, such being the favored method. As was stated in *In re Redman* (1939), 135 Ohio St. 554, 558 [29 O.O. 143]:

"So-called common-law marriage contravenes public policy and should not be accorded any favor; indeed, it is quite generally condemned. It is well-settled in Ohio that to establish a common-law marriage, all the essential elements of such a relationship must be shown by clear and convincing evidence."

As appellant concedes in her reply brief, there is a wide difference between the parties as to what actual facts existed at the time of the alleged marriage and thereafter. Specifically, conflicting evidence was presented to the trial court on whether these parties held themselves out as being married. The trial court made a specific finding that there had been no holding out, buttressed by the documents and testimony developed in the record:

"A number of documents prepared by or caused to be prepared by Hobart or Eleanor were introduced that listed Eleanor['s] or Hobart['s] marital status as unmarried. None was introduced showing the pair to be married. Considerable evidence was introduced that Eleanor and Hobart held themselves out to the family of Hobart Nestor, Sr., and others as 'friends.' Eleanor did not use the name of Eleanor Nestor and asserted her reason for not using Hobart's name or holding herself out as married was that Hobart did not want the family to know they were married."

There being ample evidence in the record to support this finding, it cannot be disturbed. *C. E. Morris Co.* v. *Foley Construction Co., supra.* In reaching its conclusion today, the majority has simply, but impermissibly, put itself in the position of the fact-finder, reweighed the facts and re-judged the credibility of the witnesses. The majority has clearly failed to accord due deference, as it must, to the findings of the trial court.

Moreover, I call upon the legislature, in this last quarter of the Twentieth Century, to act to abolish the antiquated institution of common law marriage in Ohio. The days of the walking preacher and of the bishop on

horseback are long gone. As was stated in *In re Estate of Maynard* (1962), 117 Ohio App. 315, 324 [24 O.O.2d 95]:

" ' "Is it not an amazing fact, that, in a matter which so profoundly affects the dignity and stability of a family institution, society should be slow to take enlightened action? Surely, no legislative reform is more needed than clear and positive statutes declaring such loosely contracted unions null and void." ' "

LOCHER, J., concurs in the foregoing dissenting opinion.