50 F.3d 21
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Jeanne L. GROSS, Petitioner,
v.
OFFICE OF PERSONNEL MANAGEMENT, Respondent,
and
Merit Systems Protection Board, Intervenor.
 No. 94-3119.
 United States Court of Appeals, Federal Circuit.
 March 22, 1995.
 
 Before RICH, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and MICHEL Circuit Judge.
 Opinion for the court filed by Circuit Judge RICH. Dissenting opinion filed by Circuit Judge MICHEL.
 RICH, Circuit Judge.
 
 DECISION
 
 1
 Jeanne L. Gross (Ms. Gross) seeks review of the final decision of the Merit Systems Protection Board (Board) in Docket No. CH-831M-93-0226-I-1. In an 18 June 1993 initial decision, an Administrative Judge (AJ), Mary L. Detjen, reversed a final decision of the OPM. The 18 June 1993 initial decision became the final decision of the Board on 24 November 1993 when the Board denied Ms. Gross's petition for review as not meeting the criteria set forth at 5 C.F.R. Sec. 1201.115. We affirm.
 
 DISCUSSION
 
 2
 * Mr. Donald A. Gross and Ms. Gross were married on 16 October 1965. On 27 July 1978, their marriage was dissolved in Franklin County, Ohio. One month after their dissolution, they allegedly realized their mistake and agreed to remarry and remain husband and wife. They cohabited until 1985 or 1987. Then, Mr. Gross moved into his own apartment, where he lived alone until his death on 9 April 1989.
 
 
 3
 On 30 May 1989, OPM paid Donald Bashir (Mr. Bashir), the named beneficiary, a lump sum death benefit based upon his father's, Mr. Gross's, federal service. On 14 August 1989, Ms. Gross sent an Application for Survivor Annuity to OPM. OPM then decided that she was entitled to a survivor annuity award because she had been Mr. Gross's common-law wife under Ohio law. Specifically, the OPM decided that Mr. and Ms. Gross had established a common-law marital relationship in the state of Ohio, effective September 1978. Accordingly, the OPM decided that it had overpaid Mr. Bashir $31,972.99.
 
 
 4
 Mr. Bashir was directed to repay the money. OPM denied his requests for reconsideration, and the OPM's 4 January 1994 decision became its final decision in the matter. Mr. Bashir appealed to the Board, and Ms. Gross intervened. The Board reversed OPM's decision, deciding that Mr. Bashir was entitled to the lump sum payment previously made. Ms. Gross and the OPM petitioned the Board for review, and the Board denied the petitions. Ms. Gross and the OPM then petitioned this court for review. Because the Board decided the merits of the controversy, OPM was designated as the respondent before this court.
 
 
 5
 The OPM filed its brief on 8 July 1994. In its brief, OPM argued that the Board incorrectly decided that Ms. Gross was not a common-law wife under Ohio law and that this court should reverse the Board's decision. Thus, OPM and Ms. Gross were both arguing for the same result. Since no party was arguing for the Board, this court, by an Order dated 11 April 1994, granted the Board's motion to intervene out of time and sua sponte struck OPM's brief.
 
 II
 
 6
 Under Ohio law, Ms. Gross needed to establish by clear and convincing evidence that she was the common-law wife of the decedent. Thus, she needed to prove the following:
 
 
 7
 (1) an agreement to marry in praesenti;
 
 
 8
 (2) cohabitation as husband and wife; and
 
 
 9
 (3) a reputation in the community of being husband and wife.
 
 
 10
 Nestor v. Nestor, 472 N.E.2d 1091 (Ohio 1984). Element (1) may be established by indirect evidence.
 
 
 11
 In support of her assertion that she was Mr. Gross's common-law wife, Ms. Gross asserted that they lived together until 1987 in two different homes that they purchased together, filed joint tax returns for the years 1980-1984, and shared other financial arrangements. Additionally, she submitted an affidavit by herself and affidavits from two friends and the decedent's parents in support of her contention.
 
 
 12
 In support of his assertion that Ms. Gross was not the common-law wife of Mr. Gross, Mr. Bashir submitted copies of the tax returns that Mr. Gross filed between 1986 and 1988, showing that he was single. The tax returns also indicated that the decedent did not live with Ms. Gross. Mr. Bashir also submitted a signed lease for the decedent's last address, the decedent's designation of a beneficiary, and a death certificate showing that the decedent was divorced. Additionally, Mr. Bashir submitted affidavits from some of the decedent's friends and co-workers, which supported his contention that there was no common-law marriage.
 
 III
 
 13
 Section 7703 of Title 5 strictly limits and defines our review of Board decisions. We must affirm the Board's decision unless it is:
 
 
 14
 (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 15
 (2) obtained without procedures required by law, rule, or regulation having been followed; or
 
 
 16
 (3) unsupported by substantial evidence.
 
 
 17
 5 U.S.C. Sec. 7703(c) (1988). We have carefully considered the record before us. Substantial evidence supports the AJ's findings, and we find that the AJ made no error that would support a reversal of the Board's decision. Ms. Gross acknowledges the AJ relied upon credibility determinations. Under the facts of this case, we cannot merely reweigh the evidence and make our own credibility determinations in lieu of the AJ's determinations. We therefore affirm.
 
 
 18
 MICHEL, Circuit Judge, dissenting.
 
 
 19
 Although I agree that the evidence supporting at least some of the AJ's findings of underlying fact may fairly be described as substantial, and that as the majority says "we cannot merely reweigh the evidence," I believe the AJ's entire analysis was tainted by errors of law--her misunderstanding, misstating and misapplying the Ohio law of common-law marriage. For this reason and without reweighing evidence or reassessing credibility of witnesses as found by the AJ, I would reverse the AJ and reinstitute the OPM reconsideration decision awarding the annuity to Jeanne Gross as a surviving spouse by common-law marriage.
 
 
 20
 In evaluating whether, following their court divorce, the parties entered into an agreement to marry, the primary requirement of common-law marriage, the AJ found that "the most significant factor in determining the intent to marry in praesenti ... [was] that the last legal action specifically addressing their relationship was a divorce in July 1978." (Emphasis added.) This finding demonstrates a serious misunderstanding of Ohio common-law marriage. By definition, "legal action," or the absence thereof is irrelevant to whether a common-law marriage has come into being, for Ohio accords common-law marriage the same legal status as ceremonial marriage even though not accomplished by "legal action." Further, under Ohio law, any marriage, common-law or ceremonial, can only be dissolved by death or court-awarded divorce. In re Nyhuis' Estate, 113 N.E.2d 700, 704 (Ohio Ct.App.1952). Finally, in order to marry (either ceremonially or at common law), a couple has to dissolve any prior marriage (whether it was ceremonial or common-law). Thus, if the Gross' had not obtained a legal divorce, this case would not be before this court today. The AJ, however, mistakes the necessity to terminate the prior marriage by legal action as evidence that a common-law remarriage did not arise. According to this reasoning, the only acceptable marriage for previously divorced couples wishing to remarry one another is ceremonial marriage--clearly not the law in Ohio at the time in question which recognized common-law marriages for all persons.
 
 
 21
 Based on her erroneous assumption that the Gross' had to "take legal action to alter their status as divorced persons," slip op. at 8, the AJ also refused, despite holdings of the Ohio Supreme Court, to recognize a strengthened inference of the Gross' intent to marry based on the seven-year duration of their marriage-like relationship--even though the AJ finds that they had such a relationship. In Nestor v. Nestor, 472 N.E.2d 1091, 1094 (Ohio 1984), the Ohio Supreme Court states that where there is no direct proof of formation of the contract of marriage in praesenti, testimony regarding cohabitation and community reputation tends to raise an inference of the marriage, and the inference increases with the lapse of time during which the parties are living together and cohabitating as man and wife. Id. at 1094. Thus, the AJ's disregard of the seven-year duration of their relationship in considering whether a common-law marriage arose is not in accordance with Ohio common law as declared by that state's highest court. Although ordinarily within the province of the fact-finder to make or not make, here the inference of intent to remarry was compelled as a matter of law by the uncontested facts of married life detailed below.
 
 
 22
 The AJ further misconstrues and misapplies Ohio law when she concludes that Donald Gross did not have the intent to marry Jeanne again, merely because he did not hold himself to his coworkers as married. In Nestor the court states that it is "not necessary [to] disseminate information to all society generally, or to all of the community in which they reside." 472 N.E.2d at 1095. Nor is a common-law marriage defeated "by the fact that all persons in the community ..., or all persons with whom [the couple] normally come in contact are also unaware of the arrangement." Id. Friends testified that Donald and Jeanne did hold themselves out as man and wife to friends, neighbors and others in the community. Thus, it was legal error for the AJ to conclude that Donald and Jeanne Gross also had to hold themselves out as married to everyone in the community. The AJ assumed, incorrectly, that they had to so hold themselves out to Donald's coworkers. The AJ compounded the effect of this error by treating the testimony of coworkers as negating affidavits from Donald's own parents and the couple's mutual friends of 25 and 30 years, respectively, that the couple did so hold themselves out to many persons.
 
 
 23
 Perhaps the AJ's most significant legal error, however, lies in the AJ's refusal to find that the evidence established a common-law marriage during the 1978 to 1985 period during which they lived together, because of the subsequent actions of the parties when they lived apart. Under Ohio law, if a common-law marriage arose before 1985, no event thereafter except death or a formal divorce by a court could undo it. In re Nyhuis' Estate, 113 N.E.2d at 704. Yet, the AJ concluded that either the events after 1985 retroactively rescinded the legal effect of the common-law marriage arising from the events before 1985 (or at least precluded finding intent to marry), or that on the record evidence, joint finances constituted the entirety of the relationship between Donald and Jeanne Gross between 1978 and 1985. But no evidence of record contradicted the overwhelming evidence that Donald and Jeanne acted married in all possible ways and considered themselves married until at least 1985. As to finances being the extent of their relationship, I think that under Ohio cases the conclusion is wrong as a matter of law because there was much non-financial evidence. Moreover, all the financial evidence relating to 1978-85 supported establishment of an agreement to marry in praesenti. And, for this period, there was no evidence that the relationship was limited to finances. That in a later period their only relationship was financial is irrelevant. Therefore, in finding a common-law marriage, I do not "reweigh the evidence," but merely follow Ohio law which the AJ failed to do.
 
 
 24
 The evidence of record is undisputed that within a month of their divorce being granted in 1978, Donald and Jeanne Gross resumed and continued living together as man and wife, in the same house, including sharing the same bed and sexual relations, as well as household duties, finances and social life in the community. It is also undisputed that to family, friends and neighbors (although not by Donald to his coworkers), both of them held out their relationship as being that of man and wife. Mr. Bashir's allegation that Donald was having an affair with a coworker might explain why in comments to coworkers he minimized his relationship with Jeanne. However, an affair does not operate to terminate a common-law marriage any more than a ceremonial marriage. It follows that the "effect of proof of common-law marriage is not destroyed [by a] man's later adulterous career with another woman." Ryan v. Ryan, 86 N.E.2d 44, 48 (Ohio Ct.App.1948). Nor can Donald's failure to hold himself out to coworkers as married negate the undisputed evidence that to many others in the community, he did so hold out. As a matter of law, his failure to so hold out to coworkers cannot suffice to defeat his common-law marriage.
 
 
 25
 The Gross' continuous sexual, residential, financial, social and reputational life together for seven years created a common-law marriage, and did so well before Donald Gross' departure from the home and relationship, at the earliest in 1985. There was undisputed evidence that together they bought two houses, obtaining a joint mortgage, and bought furniture, food, household supplies and clothing for all those years. They also filed joint tax returns and maintained joint bank accounts and credit cards. They entertained together and slept together. It is difficult to imagine any activity typical of a married couple that they did not pursue. Thus, that Jeanne's burden of proof of the marriage is the elevated burden of clear and convincing evidence has no effect because the dispositive evidence is uncontradicted. Nor, for the same reason, does it matter that common-law marriages are not favored.
 
 
 26
 The evidence of separate living after 1985 (or 1987) is equally compelling--separate residences, individual tax returns, discontinuation of sexual relations, no holding out as man and wife to the community and so forth. But under Ohio law, those later facts cannot terminate a common-law marriage already in being, only a legal divorce can. That law may be illogical, creating as it does asymmetry where marriages or remarriage can be informally created but only formally terminated, and, in any event, the statute has been repealed. But that was the Ohio law that controls this case, because the repealer preserved existing common-law marriages.
 
 
 27
 Whether it is inequitable for OPM to require the couple's son, Donald Bashir, to repay the $31,000 received as Donald's named beneficiary so that Jeanne Gross can enjoy her spousal survivor annuity without the government paying twice can have no place in our decision and should have had none in that of the AJ. This case is controlled by application of Ohio marriage law to uncontested acts of married life involving Donald and Jeanne from 1978-85, and neither later equities involving Donald Bashir, nor the details of Donald Gross' independent life in his last few years, so heavily relied on by the AJ in the face of clear Ohio law, can change that.
 
 
 28
 I would affirm the OPM reconsideration decision that entitlement to the pension lay with Jeanne Gross as surviving common-law spouse whose remarriage was never legally terminated, rather than with Donald Bashir, because a surviving spouse takes precedence over a named beneficiary.
 
 
 29
 I also think it unfortunate that, as the majority notes, our court sua sponte expelled OPM from participation in the appeal because its brief agreed with Jeanne Gross rather than Donald Bashir as had the Board. It was proper to allow the Board to intervene and file a brief, but not, in my view, to strike OPM's brief which at least correctly analyzed controlling Ohio law.