DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Domestic Relations Division, which granted the parties a divorce after finding that they were not married at common law before their ceremonial marriage. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} The parties met in 1975. In 1977, they had a son and began living together. They eventually married in a legal ceremony in 1998. In 2003, appellee Augustin Reyes filed for divorce. During the divorce proceedings, appellant Maria Beltran Vasquez claimed that the parties were married at common law from 1977 until the date of their ceremonial marriage. The trial court held an evidentiary hearing on this issue and determined that there was not clear and convincing evidence of a common law marriage. The trial court then divided the parties' property and granted them a divorce. Appellant now appeals, setting forth the following assignment of errors:
 {¶ 3} "The trial court erred in improperly finding the parties were not married at common law per in prasent [sic].
 {¶ 4} "Appellant, Maria Vasquez's rights were violated because she had ineffective assistance of counsel."
 {¶ 5} Appellant argues in her first assignment of error that the trial court erred in finding that she and appellee were not married at common law before the date of their ceremonial marriage. Appellant testified at the evidentiary hearing on this issue. According to appellant, she and appellee had a child together in 1977 (Juan Daniel, known as Daniel), and appellee moved into appellant's house on Stratton Street in Toledo. She testified that appellee introduced her to others, including members at their church, as his wife. When asked whether the two discussed their marital relationship, appellant testified, "We were soul mates. God put us together." Appellant testified that she and appellee never filed joint tax returns because appellee did not want to. With regard to their reputation in the community, appellant identified certain papers from Daniel's school addressed to "Mr. and Mrs. Augustin Reyes." Until about 2002, appellant and appellee attended church weekly with their son and appellant's children from a previous marriage.
 {¶ 6} Appellant was asked about her living arrangements with appellee over the years. She testified that in 1990, they bought a house on Fassett Street, and appellee would go there to live periodically whenever he got "fed up" at home. She indicated that appellee lived on Stratton Street until January 2003. Appellee's mail came to the Stratton Street house, and his clothes were there. The utility bills for the Fassett Street home went to the Fassett Street address.
 {¶ 7} Appellant next discussed the name she chose to use. Counsel noted that some of the correspondence from Daniel's school was addressed to Augustin Reyes and Maria Vasquez. When asked whether she ever used appellee's last name, she answered that she did not. When asked why, she testified, "We were not married. In our culture we don't use the husband's last name." She went on to say, "The reason I use Vasquez, Your Honor, is because in my first marriage the Judge ordered me to use Vasquez." Daniel, the parties' son, uses the last name Vasquez.
 {¶ 8} Appellant was asked about an incident in which appellee was injured and required medical treatment. Appellant testified that the hospital personnel referred to her as appellee's wife and asked her to sign papers authorizing appellee's medical treatment. Appellant signed as appellee's wife. She testified, "I was scared that I be caught — you know, because we were not legally married — you know, and sign it his wife." When asked whether she had any doubt that she and appellee were married, she answered "no," adding that she became married to him when he moved into her house in the 1970s.
 {¶ 9} On cross-examination, appellant admitted that appellee did not add her to his health insurance policy until they were married in a ceremony in 1998. Counsel also questioned appellant about the property she and appellee owned. Appellant testified that she, alone, owned the Stratton Street property and that appellee, alone, owned the Fassett Street property.
 {¶ 10} On re-direct examination, appellant testified that she only filed one tax return in the time that she has known appellee — in 1985. According to appellant, that was the only year that she had income, and she filed as head of household. She listed her underage children as her dependents. Appellant then testified that appellee lived in her house on Stratton until the last week in December 1999.
 {¶ 11} Next, Salvador Sanchez, a friend of appellant and appellee, testified. According to Sanchez, appellee introduced appellant as his wife, and Sanchez thought of the parties as husband and wife. Sanchez introduced them as husband and wife as well. On cross-examination, Sanchez admitted that he knew that the parties were not married when they began living together.
 {¶ 12} Daniel Vasquez, the parties' son, also testified. Vasquez testified that on numerous occasions he heard appellee introduce appellant as his (appellee's) wife at church and social functions. He indicated that his father's mail came to the Stratton Street house, and it was addressed in various ways, including, "Mr. Augustin Reyes or Mr. and Mrs. Augustin Reyes or Mr. Augustin Reyes and Maria Vasquez-Reyes." According to Vasquez, his father moved out of the Stratton Street home in 1997, and his parents stopped going to church together in 1995. On cross-examination, he testified that he knew his parents were not married until 1998.
 {¶ 13} Finally, appellee testified as if on cross-examination. He confirmed that he and appellant began living together in the late 1970s, after their son was born, and he admitted that he introduced appellant as his wife "ten, fifteen" times. He testified that he never denied that appellant was his wife. When asked whether people at church regarded them as husband and wife, appellee responded, "Maybe few people, some maybe don't." According to appellee, their priest regarded them as married, adding, "He didn't know that we were not married." When asked how church members regarded them, appellee testified, "people that knew us, they know we wasn't married."
 {¶ 14} Appellee testified that he moved out of the house on Stratton Street in 1997, the year before he and appellant were ceremonially married. However, before that, his mail was sent to the Stratton Street address. Appellee also testified that in the mid-1980s, he inquired at work about adding appellant to his health insurance policy and was told that he could not because they were not married.
 {¶ 15} On direct examination, the following exchange took place:
 {¶ 16} "Q: Did you marry after Daniel was born?
 {¶ 17} "A: Yes.
 {¶ 18} "Q: When was that? When did you marry her?
 {¶ 19} "A: There it was in '98, August 3rd.
 {¶ 20} "Q: Okay. Prior to August the 3rd of 1998, did you consider yourself married to Maria?
 {¶ 21} "A: No.
 {¶ 22} "Q: Okay. Did you ever celebrate any anniversaries with her prior to that date?
 {¶ 23} "A: Like husband and wife.
 {¶ 24} "Q: Like a wedding anniversary.
 {¶ 25} "A: No."
 {¶ 26} Appellee also confirmed that he never filed a joint tax return with appellant until after their ceremonial marriage. Before the ceremonial marriage, appellant often prepared appellee's tax forms for him, and his filing status was "single." He did not list either appellant or their son as his dependents. The two did not have joint bank accounts until after they ceremonially married. Finally, appellant's counsel posed the following questions to appellee:
 {¶ 27} "Q: You said that you moved into the house sometime after the birth of Daniel.
 {¶ 28} "A: Yes.
 {¶ 29} "Q: Okay. Did you and Maria have any understanding of what your relationship was at that time?
 {¶ 30} "A: We didn't talk about what kind of relationship we were going to have because we already had a son — you know, we didn't discuss they were going to be like this or they were going to be like that.
 {¶ 31} "Q: It was just left up in the air?
 {¶ 32} "A: Yeah."
 {¶ 33} Appellant argues in her first assignment of error that the court erred in finding that the parties were not married at common law prior to 1998. Though common law marriage was abolished in Ohio in 1991, those common law marriages established before that date remain valid. R.C. 3105.12(B)(2). However, common law marriage, as an institution, is disfavored in the law. Nestor v. Nestor (1984), 15 Ohio St.3d 143, 145. The elements of common law marriage in Ohio are an agreement to marry in praesenti, cohabitation as husband and wife, and a reputation in the community as a married couple. Id., quoting Umbenhower v. Labus (1912),85 Ohio St. 238, syllabus. The court in Nestor explained how the elements are met. According to the Supreme Court:
 {¶ 34} "The fundamental requirement to establish the existence of a common law marriage is a meeting of the minds between the parties who enter into a mutual contract to presently take each other as man and wife. The agreement to marry in praesenti is the essential element of a common law marriage. Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation. Although cohabitation and reputation are necessary elements of common law marriage, this court has previously held that standing alone they do not constitute a common law marriage." Nestor,15 Ohio St.3d at 146.
 {¶ 35} According to the court, the mutual agreement to marry in praesenti may be established by direct evidence or "by way of proof of cohabitation, acts, declarations, and the conduct of the parties and their recognized status in the community in which they reside." Id. Proof of the elements of common law marriage must be by clear and convincing evidence. Id. The Supreme Court of Ohio has held that clear and convincing evidence is:
 {¶ 36} "that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 37} The first question is whether the parties had a meeting of the minds — an agreement to marry in praesenti. Direct evidence of such an agreement would be proof that the parties, on a certain date, told each other "we are now married," or words to that effect. See, e.g., Nestor,15 Ohio St.3d at 144; Poland Twp. Bd. of Trustees v. Swesey, 7th Dist. No. 02 CA 185, 2003-Ohio-6726, at ¶ 28. However, as indicated, a party attempting to prove a common law marriage need not present direct evidence of an agreement to marry; such an agreement may also be established by evidence of cohabitation and a reputation in the community as a married couple. Nestor, 15 Ohio St.3d at 146.
 {¶ 38} In this case, appellant presented no direct evidence of an agreement to marry. Appellee, on the other hand, testified that he did not consider himself to be married to appellant until their ceremonial marriage in 1998. When asked whether the parties ever discussed the nature of their relationship before their ceremonial marriage, appellee testified that they never had such a discussion, and the nature of their relationship was left unsaid. Moreover, appellant conceded at least twice in her testimony that she realized that they were not married. Until the time of their ceremonial marriage in 1998, the parties neither had joint bank accounts nor filed taxes jointly,[1] and appellee did not add appellant to his health insurance until after the ceremonial marriage. The parties never owned real estate together, each holding a piece of real estate in his or her own name. Therefore, not only is there no direct testimony that the parties agreed to marry in praesenti, there is testimony that they did not make such an agreement. Nevertheless, we shall examine the other two elements, cohabitation and reputation in the community, to determine whether there is indirect evidence of an intent to marry.
 {¶ 39} The undisputed evidence was that the parties lived together from 1977 until at least 1990. After that time, however, both parties agreed that appellee moved back and forth between the Stratton Street home and the Fassett Street home. The evidence is disputed as to when appellee moved out for good: Appellee and the parties' son, Daniel, testified that appellee moved out in 1997; appellant testified that appellee did not move out of the house until either the end of 1999 or until 2003. Therefore, the testimony is conflicting as to whether appellant and appellee lived together for the entire duration of the purported common law marriage.
 {¶ 40} As for their reputation as a married couple in the community, appellee testified that he had, on at least some occasions, introduced appellant as his wife. He also testified that he never denied that appellant was his wife. Salvador Sanchez, the family friend who testified, confirmed that appellee introduced appellant as his wife. However, Sanchez also admitted knowing that the parties were not married when they moved in together, and he never saw the parties celebrate an anniversary, although he was present at the home for many other family celebrations. And appellee testified that a "few" people in the community may have believed that he was married to appellant but "some maybe don't," adding that people who knew them knew that they were not married.
 {¶ 41} The evidence on this issue of an agreement to marry in praesenti is conflicting. Because it is conflicting, we cannot say that the trial court erred in finding that appellant did not present clear and convincing evidence of a common law marriage. In a similar case, we stated:
 {¶ 42} "For virtually every piece of evidence presented by appellant to establish an agreement to be married or a holding out, appellee offered effective and credible contradictory evidence. At the very best, the evidence was of equal weight and, in such a situation, the burden of proof has not been sustained by the party asserting any given proposition." Root v. Root (July 25, 1986), 6th Dist. No. L-85-432.
 {¶ 43} Appellant's first assignment of error is found not well-taken.
 {¶ 44} In her second assignment of error, appellant contends that she was denied effective assistance of counsel. According to the Ohio Supreme Court, a civil litigant is not entitled to a new trial based on ineffective assistance of counsel. Goldfuss v. Davidson (1997),79 Ohio St.3d 116, 122. If an attorney's performance is deficient, the civil litigant's remedy is an action for attorney malpractice. Id. Appellant's second assignment of error is found not well-taken.
 {¶ 45} Upon due consideration, we find that substantial justice has been done the party complaining, and the decision of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the court costs of this appeal.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Skow, J., Parish, J., Concur.
[1] We are mindful that filing a tax return as a single person does not, in itself, negate the existence of a common law marriage. SeeNestor, 15 Ohio St.3d at 148 (finding a common law marriage despite that fact that the wife had agreed to keep her records in her own name); In reEstate of Weston (Mar. 21, 1986), 6th Dist. No. L-85-241 (filing taxes as a single person is not conclusive evidence that the parties did not have a common law marriage). As we view the law in this area, no one piece of evidence is conclusive; we must consider the record as a whole.