OPINION *Page 2 
{¶ 1} Appellant Deborah Hill appeals from the February 6, 2007, order of the Perry County Court of Common Pleas, Probate Division, which found Brenda Hill to be the surviving spouse of Daniel Hill.
 {¶ 2} Appellant Deborah Hill had petitioned the Probate Court for an order determining that she was the next of kin/surviving spouse of Daniel Hill.
 STATEMENT OF THE FACTS AND CASE {¶ 3} Defendant-appellee Brenda Hill and Daniel Clarence Hill were married on November 19, 1988. Daniel Clarence Hill [hereinafter "the decedent"] died on February 20, 2006, leaving two children, Amanda Dunlap and Angela Sanders. While Marian Hill is the mother of Amanda Dunlap, appellant Deborah Hill is the mother of Angela Sanders.
 {¶ 4} On May 26, 2006, appellant Deborah Hill, individually and as Administrator of the Estate of Daniel Clarence Hill, filed a Complaint to Determine Heirship against appellee Brenda Hill and the decedent's two children. Appellant, in her complaint, alleged that she was the common law wife of the decedent and that the decedent had married appellee Brenda Hill "without decedent being divorced from Deborah Hill in their common-law marriage relationship that commenced in February, 1983." Appellant asked the trial court to determine that she was the surviving spouse of the decedent.
 {¶ 5} A trial was held on October 30, 2006. The following testimony was adduced at trial. *Page 3 
 {¶ 6} At the trial, Mary Ann Grimshaw testified that she lived in Perry County from 1971 to 1982 and that she knew appellant and the decedent who were customers in her shop. Grimshaw testified that she delivered pizza to their home and that it was common knowledge that the two were living together as common law man and wife. According to Grimshaw, appellant always used the name Deborah Hill. Grimshaw testified that she did not know appellant by any other name.
 {¶ 7} On cross-examination, Grimshaw testified that she did not know of any other spouses that appellant or the decedent might have had and that she had had no contact with the decedent or appellant after 1982. She further testified that she heard other people refer to appellant and the decedent as husband and wife. On redirect, she testified that she might have moved from Perry County a little later than 1982, but that it was not much later.
 {¶ 8} The next witness to testify was Larry Greenlee. Greenlee testified that he had known the decedent for almost thirty (30) years and that he also knew both appellant and appellee. He testified that he fished and hunted with the decedent and traveled with him to different states. Greenlee further testified that he met appellant in the early 1970s and that the decedent presented appellant to him as his wife and called her his wife. The following is an excerpt from Greenlee's testimony:
 {¶ 9} "Q. Allright [sic], let me ask you, when do you belive [sic], your recollection is, that you met Deborah Hill?
 {¶ 10} "A. Oh, man. Early seveties [sic].
 {¶ 11} "Q. So, you saw her from the seventies and into the eighties too?
 {¶ 12} "A. Yes. I mean it wasn't every day, a couple a years in between. *Page 4 
 {¶ 13} "Q. How did Daniel present Deborah to you.
 {¶ 14} "A. As his wife, as his, she had kids, he treated her kids like they were his kids, like a family.
 {¶ 15} "Q. Did he call her his wife?
 {¶ 16} "A. Yes.
 {¶ 17} "Q. Did you belive [sic] them to be married?
 {¶ 18} "A. No, I have to say that, because we had been apart, I didn't know if they got married or any thing like that. I didn't know for sure.
 {¶ 19} "Q. But that is what he called her?
 {¶ 20} "A. Yes.
 {¶ 21} "Q. When you were around him, did he present her as his wife to other people, also?
 {¶ 22} "A. Yes. He would say things like, well I've got to get home to the wife and stuff like that. Just little things he would say.
 {¶ 23} "Q. Would these conversations be in front of other people as well as yourself?
 {¶ 24} "A. Yes, it would be. Yes. In front of his friends and neighbors or whatever." Transcript at 11 -12.
 {¶ 25} Greenlee further testified that he attended the decedent's wedding to appellee, but that he never questioned the decedent about whether or not he had divorced appellant because the two did not discuss personal matters. According to Greenlee, the decedent had lived with a woman named Mary at some point in time. *Page 5 
 {¶ 26} On cross-examination, Greenlee testified that the decedent and appellant acted like husband and wife and that the decedent had raised appellant's children.
 {¶ 27} Honi Greenlee, Larry Greenlee's wife, testified that the decedent had introduced her to her husband almost twenty-five years before. She testified that she met appellant a few days after she had met the decedent and that the decedent introduced appellant as his wife. Honi Greenlee further testified that the two lived together for a number of years. According to Honi Greenlee, in 1986, 1987 or 1988, the decedent had a girlfriend named Mary who he wanted to marry. The following testimony was adduced when Honi Greenlee was asked whether the decedent ever spoke about divorce:
 {¶ 28} "A. Yeah, he did when, uh, we were up visiting from West Virginia and Mary handed me a letter to read, um, about. . . .They were wanting to get married.
 {¶ 29} "Q. Dan and Mary?
 {¶ 30} "A. Dan and Mary were wanting to get married and Mary had me read this letter from Debbie that said they couldn't get married without him getting divorced first.
 {¶ 31} "Q. Debbie, your [sic] talking about Debbie Hill?
 {¶ 32} "A. Debbie Hill.
 {¶ 33} "Q. Did Daniel actually go. . . .
 {¶ 34} "A. Dan said he couldn't afford an attorney and Mary was real upset about it `cause they couldn't get married `cause he was already married.
 {¶ 35} "Q. Mary, can you remember what her name was?
 {¶ 36} "A. Schnider, Snyder, I'm. . . ." Transcript at 19. *Page 6 
 {¶ 37} Honi Greenlee further testified that the decedent and appellee were off and on and that appellee would leave and appellant would come back and that appellant would then leave and appellee would come back.
 {¶ 38} On cross-examination, Honi Greenlee testified that she met appellant in 1981 when the decedent introduced her as his wife. She testified that she did not know that appellant was still married to another man at that time. When asked whether it would surprise her to know that appellant did not get a divorce from her husband until 1982, Honi testified that she did not know that appellant was married before. She further testified that the decedent introduced Mary to people as his "old lady."
 {¶ 39} At the trial, Sandra Ellis testified that she lived in Perry County from about 1973 until the mid or late 1980s. She testified that she lived on the same road as appellant and the decedent and that her husband and the decedent were both truck drivers and interacted as part of their work. According to Ellis, the decedent introduced appellant as his "old lady." Ellis further testified that she became good friends with appellant and that appellant told her that she had a common law marriage. When asked, Ellis testified that the decedent and appellant held themselves out as being married and that they were commonly believed to be a married couple.
 {¶ 40} On cross-examination, Ellis testified that she first met appellant in approximately 1982 and that appellant told her maybe six months later that it was a common law marriage. She also testified that appellant used the same last name as the decedent. Ellis further testified that, after appellant and the decedent broke up, the decedent lived with another woman. *Page 7 
 {¶ 41} Patrick Greene testified that he met the decedent playing football in the seventh grade. He further testified that the decedent introduced appellant as his wife and that the decedent "seemed to be with different women." Transcript at 33. Patrick Greene further testified that the decedent told him that appellant would not give him a divorce, although he was unsure when such conversation occurred. He further testified that he thought that the decedent had married appellant in California and that the two acted as a married couple.
 {¶ 42} On cross-examination, Patrick Greene testified that the decedent introduced appellant as his wife in approximately 1981 and that the decedent was not with any other woman when he was with appellant. According to Patrick Greene, after the decedent broke up with appellant, he referred to other women who he was with as his girlfriend.
 {¶ 43} The next witness to testify was Cathy Jo Fields, who was friends with the decedent's daughter Amanda in 1983 or 1984 while the two were growing up. Fields testified that her understanding from being around the decedent and appellant was that the two were in a common law marriage. She further testified that she asked her father what a common law marriage was and that he explained the same to her. According to Fields, the decedent and appellant appeared to be a family living together. She further testified that the two referred to each other as "my old man" or "my old lady."
 {¶ 44} Forrest Hartman also testified at the trial. Hartman testified that the decedent was his uncle and that he lived with the decedent and appellant for a period. Hartman testified that he first met appellant in 1976 when the decedent introduced her to him as "your aunt Debbie." Transcript at 45. Hartman testified that the decedent and *Page 8 
appellant appeared to be living as husband and wife with their kids in 1983 or 1984 and that most people viewed them as married.
 {¶ 45} On cross-examination, Hartman testified that he lived with appellant and the decedent from 1980 to 1982 and then left and came back and forth. He further testified that he went to Florida with the decedent and appellee in 1982 and that he introduced appellee to him as "Brenda."
 {¶ 46} Margi Curry, the next witness to testify, testified that she was friends with the decedent and babysat his daughter Amanda. According to Curry, at one point, the decedent wanted to marry Mary Snider but there were some problems with paperwork. Curry testified that the decedent introduced appellant to her as his wife. Curry further testified that appellant took care of everything, including bills, because the decedent liked to be taken care of. She further testified that, to her knowledge, the decedent never got a divorce from appellant.
 {¶ 47} Laura Bailey also testified at trial. Bailey testified that she met the decedent in March of 1973 and that she met appellant, who she always knew as "Deborah Hill", in 1981. Bailey testified that the decedent referred to appellant as his wife and that they appeared to be living as husband and wife with their daughter. Bailey, who is appellee's cousin, testified that she went to appellee's wedding to the decedent in 1988. The following is an excerpt from Bailey's testimony:
 {¶ 48} "Q. Prior to eighty-eight, when this living room wedding that you attended happened, what had Dan said about this relationship with Debbie? *Page 9 
 {¶ 49} "A. I think that Dan went back and forth between women so many times over the years that he spent more time out west with Debbie than he did back here with anyone.
 {¶ 50} "Q. But she was back here too.
 {¶ 51} "A. Who?
 {¶ 52} "Q. Debbie.
 {¶ 53} "A. Right.
 {¶ 54} "Q. Well, you told me early about a hippie exchange or some strange words to that effect, what was that you were telling me?
 {¶ 55} "A. That was his attitude. He was a hippie and he had a woman here, a woman here, a woman here, but there was always a stable one that was in the background and that was Deb.
 {¶ 56} "Q. Okay, and your [sic] talking about Deb Hill?
 {¶ 57} "A. Yes.
 {¶ 58} "Q. Did he tell you that he had exchanged vows in the pirvacy of their home?
 {¶ 59} "A. Yes, he did.
 {¶ 60} "Q. When did he do that?
 {¶ 61} "A. He told me that they were laying [sic] in the bed and they exchanged their own personal wedding vows to each other.
 {¶ 62} "Q. And that was prior to eighty-eight?
 {¶ 63} "A. That was prior to eighty-eight." Transcript at 59-60. *Page 10 
 {¶ 64} On cross-examination, Bailey testified that she never talked to the decedent about divorcing appellant before marrying appellee. She further testified that she did not know that appellant was married to another man as of December of 1981. When asked how the decedent introduced other women to her, Bailey testified that he introduced them to her by their name. On redirect, she testified that appellant was the only person, other than Brenda, who he talked about as his wife.
 {¶ 65} The decedent's daughter, Amanda Dunlap, was the next witness to testify at trial. Dunlap, who was born in 1971, testified that her mother was Marion Dunlap. Dunlap further testified that she lived in Ohio off and on from 1983 and that she lived with her father, appellant and her sister Angela. Dunlap further testified that appellant was introduced to her in 1978 as her step-mother and that she assumed the two were married. According to Dunlap, she asked her father how he could marry appellee when he was already married to appellant and her father did not respond. Dunlap further testified that appellee moved out about a month after the wedding and then resumed living with the decedent in 1998 or 1999. When asked who was living with her father between 1989 and 1997, Dunlap responded "Deborah." She further testified that appellant attended parent-teacher conferences at school with the decedent and was introduced at school by the decedent as his wife.
 {¶ 66} On cross-examination, Dunlap testified that her father was involved with other women during the same years and that he introduced the women to her by their name.
 {¶ 67} Dunlap's sister, Angela Saunders, testified at trial that she was born in 1977 to the decedent and appellant. She testified that the family moved back and forth *Page 11 
between Ohio and California. She further testified that as far as she knew, her parents were married and she never suspected that they were not because her mother had her father's last name and they referred to each other as husband and wife. According to Saunders, the two were thought of as a married couple. She further testified that when her father later introduced Mary to her, he just introduced her by her name and that, as far as she knew, people did not think the two were married.
 {¶ 68} Appellant testified at trial that Marion Dunlap was the decedent's first wife and Amanda's mother. She further testified that she divorced her first husband, George Stanley, in May of 1982. Appellant testified that Exhibit No. 8 was a document in the decedent's handwriting from 1989 in which he stated that she was his wife. The document had been prepared when the decedent went into the VA Hospital for rehabilitation so that he could stop drinking. Appellant testified that, from the summer of 1982 until the winter of 1984, they moved back and forth between Ohio and California. She further testified that they split in February of 1984 due to the decedent's drinking and cheating.
 {¶ 69} Appellant further testified that both she and the decedent told Children's Services that they were married after someone called the agency on them. Documents from 1984 admitted at trial from Children's Services refer to Mr. and Mrs. Hill and the Hill residence. See Exhibit 9. The face sheet, which is part of Plaintiff's Exhibit 9 and is dated January 9, 1984, indicates that the decedent and appellant were married. Appellant admitted that the marriage license for the decedent and appellee shows the decedent having a prior divorce in 1973 from Marion Dunlap, but did not mention her. Appellant testified that she lived with the decedent from 1989 through 1996. *Page 12 
 {¶ 70} Appellant further testified that she and the decedent, as Deborah and Daniel Hill, received food stamps in 1990 and that, in 1994, they filed a joint tax return. Testimony also was adduced that the decedent and appellant, in 1995, filed a joint petition in bankruptcy as husband and wife and, in 1994 and 1995, received Ohio General Assistance Medical Cards in the names of Daniel Hill and Deborah Hill. With respect to the bankruptcy, appellant testified that many of the debts on the petition were listed as joint debts and that, on the petition, they indicated that they were married. Evidence also was adduced at trial that the decedent listed appellant as his wife on a VA Medical Discharge form dated December 21, 1989. See Plaintiffs Exhibit 8.
 {¶ 71} At the trial, appellant testified that, in 1995, appellant deeded her one half interest in a house and that the deed, which was admitted as Plaintiffs Exhibit 14, stated that Daniel Hill was the husband of the grantee. She testified that, in February of 2001, she quit claimed the property to the decedent because they had separated and he wanted her name off of the deed. The quit claim deed indicated that appellant was the decedent's former spouse. Appellant testified that they never got a divorce.
 {¶ 72} At the trial, appellant testified that, in 1995, she used the name Deborah Hill on her W-2. She further testified that she first met the decedent in 1975 in California, where she was born, and that they started living together in 1975. She testified that the decedent left in April of 1976 to return to Ohio and then came back a few weeks later and asked her to marry him and have his child. She testified that within a month she was pregnant and they agreed that they were husband and wife. Appellant testified that the decedent came back in the winter and then left in the summer until 1982, when they moved back to Ohio together and stayed all summer. The two lived in Ohio and *Page 13 
California. She testified that, in 1983, they exchanged vows in bed in Ohio. Appellant testified that she moved out in 1984 and did not cohabitate again with the decedent until 1989. According to appellant, between 1984 and 1989, the decedent was with Mary Snider and then with appellee. The following is an excerpt from appellant's testimony:
 {¶ 73} "Q. There was previous testimony about Mary Snyder. That he couldn't marry here because he was still married to you?
 {¶ 74} "A. Oh, that. When I was in L.A., because I went back out to Los Angeles because my mom was deathly ill. That was eighty-five through eighty-seven. Daniel called my son and told him he wanted to get married to Mary Snyder. He was gonna [sic] have a judge or a lawyer or somebody send me a letter and if I didn't answer it then the marriage would be dissolved but if I did answer it then the marriage would stand. The letter did come after Christmas and I did answer it. I said [I] was not going to pretend like this didn't happen, that we had a daughter and it matters. So, I'm not going to go along with this. If he wants to divorce me then he could go pay a lawyer and divorce me.
 {¶ 75} "Q. And that never occured [sic]?
 {¶ 76} "A. No. . . ." Transcript at 93.
 {¶ 77} Appellant then testified that she lived with the decedent from 1989 through 1996 and that, during such time, they held themselves out as a married couple. She testified that, during such time, they collected welfare and she obtained a student loan as husband and wife.
 {¶ 78} Appellant further testified that, in the late spring or summer of 1983, she changed her name on her social security card and driver's license and that she *Page 14 
separated from the decedent in 1984. On cross-examination, she testified that Plaintiffs Exhibit 9, which is from the period of time when she was involved with Children's Services, indicated that she was never married. Appellant, when asked, testified that she never attempted to contest the decedent's marriage to appellee, that, after 1996, she never collected any of his veteran's benefits, and that her name was not listed on the death certificate as his wife. On redirect, she testified that the face sheet from Children's Services, which is dated 1984, indicates that the two were married and that the narrative contained in the Children's Services records continually refer to the Hills.
 {¶ 79} The next witness to testify at trial was Peggy Hammer. Hammer testified that she had continual contact and was close with the decedent from 1982 until his death and that she never knew him to acknowledge a marriage to appellant. She testified that he referred to appellant as "Debbie" and that he never introduced her or referred to her as his wife. She further testified that she has known appellee since 1989 and that she never knew the decedent to have a relationship with appellant and did not know them to be husband and wife.
 {¶ 80} On cross-examination, Hammer testified that she did not know the decedent had ever lived in California, that he had held himself out to the welfare department or Children's Services as being married to appellant or that the two had filed a joint tax return or bankruptcy petition. She admitted that she did not know that he had signed a deed to real estate claiming that he was appellant's husband and testified that he never got into his personal business. Hammer testified that she did not get invited to *Page 15 
the decedent's wedding to appellee in 1988 and did not know that he had been married before.
 {¶ 81} Appellee Brenda Hill was the final witness to testify. Appellee testified that she married the decedent in 1988 and that the two split up for six years before getting back together in 1996. She testified that she first met the decedent in 1973 and had continual contact with him until their marriage and that the decedent told her "umpteen dozen times" that he would never marry appellant. Transcript at 115. Appellee testified that she was aware of the decedent's first marriage to Marian Dunlap. She further testified that during the six years that she and the decedent were apart, he was with a woman named Sue, with appellant and with other women and that he could not make up his mind what he wanted. She testified, when asked, that she was unaware that the decedent had filed a joint tax return with appellant, but was aware that the two had filed a bankruptcy petition together.
 {¶ 82} On cross-examination, appellee testified that she received a veteran's pension from the decedent. She also testified that the decedent was in and out of her life for at least thirty (30) years. When asked, she testified that she did not know that, in some VA documents, the decedent had indicated that he was married to appellant.
 {¶ 83} At the conclusion of the testimony, the trial court took the matter under advisement and both parties filed post-trial briefs. Pursuant to an Order filed on February 6, 2007, the trial court held that appellant had not established that she was the decedent's common law wife. The trial court, in its Order, stated, in relevant part, as follows: *Page 16 
 {¶ 84} "The Court hereby finds from the evidence presented and testimony given that the Petitioner, Deborah Hill, has not established that she is a common law wife of Daniel Hill. Although the Court believes that she did live with Daniel Hill and that they did live as if they were husband and wife, the Court must go by the evidence. The evidence is that she was married to George Stanley until 1982 and therefore unable to then use evidence during the time she was still married to prove that she could have been the common law wife of Daniel Hill. The ceremonial marriage took place in 1988 to Brenda Hill. The fact that Deborah Hill was unable to prove the common law marriage of her and Daniel makes the existence of the ceremonial marriage valid. Therefore, the Court has no choice but to declare Brenda Hill as the surviving spouse of Daniel Hill. What Deborah was able to prove occurred after 1988 in essence has no bearing because at that time he was married to Brenda Hill and was so until his death."
 {¶ 85} In the Findings of Fact and Conclusion of Law filed on March 6, 2007, the trial court indicated that the evidence presented by appellant was "inconclusive."
 {¶ 86} It is from the trial court's February 6, 2007 Order that appellant now appeals, raising the following assignment of error:
 {¶ 87} "THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO FIND THAT A COMMON LAW MARRIAGE EXISTED BETWEEN APPELLANT, DEBORAH J. HILL AND DANIEL CALRENCE [SIC] HILL ON AND AFTER 1982."
 I {¶ 88} Appellant, in her sole assignment of error, argues that the trial court abused its discretion by failing to find that a common law marriage existed between appellant and the decedent, Daniel Clarence Hill, on and after 1982. We disagree. *Page 17 
 {¶ 89} Common law marriages have been prohibited in Ohio since 1991, but common law marriages occurring prior to October 10, 1991 remain valid. R.C. 3105.12(B)(1). The elements of a common law marriage are: (1) an agreement of marriage in praesenti; (2) cohabitation of the individuals as husband and wife; and (3) the treatment and reputation of the couple as husband and wife in the community and circle in which they reside. DeCarlo v. Estate of Maxwell, 167 Ohio App.3d 131, 134,2006-Ohio-3116, 854 N.E.2d 230, fn. 2, citing Craft-Glover v.Glover, Summit App. No. 21281, 2003-Ohio-1292, ¶ 7. "The fundamental requirement to establish the existence of a common law marriage is a meeting of the minds between the parties who enter into a mutual contract to presently take each other as man and wife. The agreement to marry in praesenti is the essential element of a common law marriage. Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation. Although cohabitation and reputation are necessary elements of a common law marriage, this Court has previously held that standing alone they do not constitute a common law marriage." Nestor v. Nestor (1984),15 Ohio St.3d 143, 146, 472 N.E.2d 1091, citing In re Redman (1939),135 Ohio St. 554, 21 N.E.2d 659.
 {¶ 90} According to the court, in Nestor the mutual agreement to marry in praesenti may be established by direct evidence or "by way of proof of cohabitation, acts, declarations, and the conduct of the parties and their recognized status in the community in which they reside." Id. Proof of the elements of common law marriage must be by clear and convincing evidence. Id. The Supreme Court of Ohio has held that clear and convincing evidence is: "that measure or degree of proof which is more than a *Page 18 
mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v.Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.
 {¶ 91} Because polygamy is prohibited in Ohio, a person cannot establish a common law marriage while that person is still lawfully married to another spouse. See Nyhuis v. Pierce (1952), 65 Ohio Law Abs. 73, 114 N.E. 75. Thus, as noted by the trial court, because appellant did not obtain a divorce from her husband, George Stanley, until May of 1982, "the date and time for [appellant] to establish that she has a common law marriage must occur after May 17, 1982." Thus, any testimony or evidence concerning the period prior to such date is not relevant.
 {¶ 92} The first issue to address is whether the parties had an agreement to marry in praesenti. In the case sub judice, appellant presented direct evidence of an agreement to marry. Laura Bailey testified at trial that the decedent told her that, prior to 1988, he had exchanged wedding vows in the privacy of his own home with appellant. Appellant testified that, in 1983, they exchanged vows in bed in Ohio. Thus, there was evidence that there was an agreement of marriage in praesenti.
 {¶ 93} However, for there to be a valid common law marriage, the agreement of marriage in praesenti must be accompanied and followed by cohabitation as husband and wife and reputation in the community as husband and wife. See Nestor, supra. Testimony was adduced at trial that from 1984 to 1989, appellant and the decedent were not cohabitating and that, during such time, the decedent lived with another *Page 19 
woman named Mary Snider or Snyder and then lived with appellee. Testimony also was adduced that the decedent commonly referred to the woman who he was seeing as his "old lady." Moreover, it is significant to note that when the decedent applied for a marriage license to marry appellee, he listed his prior marriage to Marian Dunlap on the application but did not list any other marriages.
 {¶ 94} In addition, the trial court does not mention the evidence regarding an agreement of marriage in praesenti in its final order or in its findings of fact and conclusions of law. Therefore, we do not know whether the trial court found that it was, in of itself, not sufficient to prove a common law marriage or whether the trial court found the testimony not to be credible. But, assuming the trial court gave it credence, we find that the trial court did not abuse its discretion in determining that the appellant did not prove the existence of a common law marriage.
 {¶ 95} Furthermore, we note that the testimony of many of appellant's witnesses was not relevant. Mary Ann Grimshaw's testimony was not probative because it relates to the period prior to May 17, 1982. We note that Larry Greenlee, when questioned, testified that he did not know if the decedent had married appellant or not. While Forest Hartman, the decedent's nephew, testified that the decedent told him that appellant was his aunt, such statement was made prior to appellant's dissolution from George Stanley in 1982.
 {¶ 96} At the hearing, Laura Bailey testified that the decedent "went back and forth between women" and that when she questioned appellee about appellant, appellee told her that "Dan [the decedent] said he didn't' need a divorce, [in order to marry appellee] he wasn't' married to her [appellant]." Transcript at 59. *Page 20 
 {¶ 97} Appellant, at trial, also submitted numerous documents in support of her assertion that she and the decedent had a common law marriage. While such documents appear to be between a husband and wife, as noted by the trial court, the majority of the documents are dated after the decedent's ceremonial marriage to appellee on November 14, 1988. Because appellant was unable to establish the existence of a common law marriage prior to the decedent's ceremonial marriage in 1988 to appellee, the ceremonial marriage was valid and, as noted by the trial court, what appellant "was able to prove occurred after 1988. . .has no bearing. . ."
 {¶ 98} Appellant was divorced from her husband in May of 1982. Daniel Hill married appellee in November of 1988. Appellant, therefore, had to prove by clear and convincing evidence that a common law marriage was formed during the period between May of 1982 and November of 1988. Based on the evidence presented, we do not find that the trial court abused its discretion in finding that appellant did not prove the existence of a common law marriage.
 {¶ 99} Based on the foregoing, we find that the trial court did not err in finding that there was no common law marriage between appellant and the decedent and that appellee, rather than appellant, was the decedent's surviving spouse.
 {¶ 100} Appellant's sole assignment of error is, therefore, overruled. *Page 21 
 {¶ 101} Accordingly, the February 6, 2007, Order of the Perry County Court of Common Pleas, Probate Division, is affirmed.
Edwards, J., Hoffman, P.J. and Wise, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Perry County Court of Common Pleas, Probate Division, is affirmed. Costs assessed to appellant. *Page 1